UNITED STATES of America, Plaintiff,

v.

HITACHI AMERICA, LTD., and Hitachi, Ltd., Defendants.

Slip Op. 97–46.
Court No. 93–06–00373.

United States Court of International Trade.

April 15, 1997.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (James W. Poirier, Cynthia B. Schultz, and Lesleyanne Kessler, Washington, DC); of counsel: Judith L. Altman, Carle Place, NY, Colleen M. Piccone, Newark, NJ, and Alan C. Cohen, United States Customs Service, Washington, DC, for plaintiff.

Weil, Gotshal & Manges, L.L.P. (John R. Wing, Lawrence E. Elder and Yoav M. Griver, New York City), for defendant Hitachi America, Ltd.

Kirkland & Ellis (William A. Streff, Chicago, IL, Eugene F. Assaf, Paul F. Brinkman, and David G. Norrell, Washington, DC), for defendant Hitachi, Ltd.

## OPINION

MUSGRAVE, Judge.

The government brought this action against Hitachi America, Ltd. ("Hitachi America") and Hitachi, Ltd. ("Hitachi Japan") in a bid to recover penalties and lost duties under 19 U.S.C. § 1592. The government alleged in the alternative that Hitachi America and Hitachi Japan are liable for violating customs laws by committing fraud, gross negligence, or negligence in connection with imported merchandise, and that Hitachi Japan is also liable as an aider or abettor. The Court entertains jurisdiction under 28 U.S.C. § 1582. The trial was conducted *de novo*. 19 U.S.C. § 1592(e)(1). For reasons which follow, the Court holds that Hitachi America is liable for negligent violations of customs laws and that Hitachi Japan is liable for aiding or abetting Hitachi America in its tortious course of conduct. Pursuant to 19 U.S.C. § 1592, defendants are jointly and severally liable for the $1,545,970 penalty assessed by the Court, and Hitachi America must remit an additional $96,469, the remainder of lost duties it has not yet restored to the government.

## BACKGROUND

This controversy concerns the importation of unfinished subway car components and parts delivered to the Metropolitan Atlanta Rapid Transit Authority (MARTA) during the 1980's. The MARTA project initially comprised the purchase of 30 subway cars (referred to as the "base buy") for use in the Atlanta, Georgia subway system. The project was subsequently extended by MARTA's exercise of 4 options for a total of 90 additional subway cars. MARTA's first request for bids did not contain the price adjustments at issue in this case. After MARTA rejected

all the bidders' prices as too high, MARTA then revised the terms of the contract, which was entitled "Contract CQ–311", and incorporated two price adjustment clauses: an Economic Price Adjustment ("EPA") clause, by which MARTA assumed the risk of inflation on labor and material, and a Monetary Value Adjustment ("MVA") clause, by which MARTA guaranteed a fixed amount of yen for foreign-procured materials. Pursuant to the MVA clause, MARTA assumed the risk of a depreciation of the dollar but would also enjoy the benefit of any appreciation of the dollar. Hitachi Japan negotiated the contract with MARTA. A joint venture consisting of Hitachi America and C. Itoh America ("CIA") was awarded this revised contract on September 27, 1982. Contract CQ–311, which explicitly contained the EPA and MVA clauses, was publicly available. MARTA itself issued a press release indicating that the Contract included "$3.7 million for projected currency exchange rate and inflation."

The subway cars consisted mainly of domestic content, some of which was exported to Japan and incorporated into the vehicles at Hitachi Japan's Kasado Works factory. The partially completed subway cars and components were then sold to C. Itoh Ltd. ("CIJ"), a Japanese corporation. CIJ is one of the world's largest trading companies, specializing in the purchase and sale of various merchandise throughout the world. Transactions between CIJ and Hitachi Japan were in yen pursuant to separate purchase orders. CIJ then sold the merchandise to the Hitachi America–CIA joint venture. Hitachi America was the importer of record, and imported the partially completed subway cars principally through the port of Savannah, Georgia. Hitachi America issued purchase orders to CIJ in dollars which referenced the EPA clause. The cars were then sent to MARTA's Avondale Yards in Atlanta for final assembly by U.S. subcontractors. CIA was the banker for the MARTA transaction. CIA maintained an account for Hitachi America from which customs duties were paid, and CIA paid CIJ in yen. CIA also invoiced and received payments from MARTA. CIA was responsible for paying domestic and foreign vendors, including CIJ, for the merchandise incorporated into the subway cars.

Pursuant to CQ–311, MARTA paid the joint venture of Hitachi America and CIA according to various progress points, called "milestones", which were based on the completion and delivery of the subway cars. The 250 milestone payments by MARTA were not and could not be directly correlated to the forty-one entries at issue in this case. The amount of EPA paid by MARTA was derived quarterly following the publication of various indices. The amount of EPA paid by MARTA could not be determined at the time of entry. The amount of MVA paid by MARTA was derived pursuant to a formula based upon the timing of various milestone payments. The amount of MVA paid by MARTA similarly could not be determined at the time of entry or correlated to specific entries of merchandise. Thus, at the time of each entry, neither the importer nor the U.S. Customs Service ("Customs") could determine the amount of future additional duties owed on any EPA and MVA payments.

A cost engineer at Hitachi Japan's Kasado Works factory computed detailed budgets for various costs attributable to the MARTA project, including import duties. The amount of $607,050 was allocated for Hitachi America's payment of import duties for the base buy of the first 30 cars. This duty budget included an estimate for duties on both EPA and MVA payments. The formula used to estimate EPA and MVA duty payments in the original budget was also utilized to calculate subsequent duty budgets for the 1st, 2nd, 3rd and 4th options, and the formula remained unchanged throughout the project. The total duty budget, including payments for EPA and MVA, was approximately $2,000,000, and was allegedly held by CIA. At the end of the project in 1988, Hitachi America had approximately $298,000 left over in this $2,000,000 duty budget after the payment of approximately $1,700,000 for import duties incurred on the base price of the imported merchandise. As the shipments began in 1984 and 1985, defendants discussed how to allocate EPA money that would eventually be received from MARTA. Hitachi America successfully negotiated to receive

approximately 2.7% of the domestic EPA for additional duty on EPA payments. The defendants also agreed that if there were a budgetary shortfall in duties owed on the MARTA contract, Hitachi Japan would be responsible for the shortfall.

At the time of the first shipment of unfinished subway cars in 1984, Hitachi America and Hitachi Japan understood that EPA payments were dutiable. However, neither Hitachi America nor Hitachi Japan had prior experience with MVA adjustments. Whether such payments were subject to duty was apparently unclear to defendants at the time of the first shipment. The defendants observed that at the time of shipment, EPA and MVA amounts were not yet fixed, and thus the amounts of EPA and MVA payments could not be known at the time of shipment. Based on this fact and on their alleged past practice in previous long-term projects subject to escalation, the defendants decided that only the base price needed to be reported on the invoice submitted to Customs, and the escalation payments could be reported to Customs and tendered at the end of the project. Many of the witnesses from Hitachi America and Hitachi Japan attested to their belief that the amount of duties could be finalized and paid after the ultimate liquidation at the end of the project. Some of the witnesses also testified that they expected Customs to request information from Hitachi America throughout the course of the project regarding the amount of escalation received from MARTA. Customs never issue any such requests to Hitachi America. In any event, the shipping invoice declaring the base price in dollars without reference to escalation clauses was presented to Customs by Hitachi America and was prepared with assistance from Hitachi Japan and CIJ. Hitachi America referenced "CQ–311" ninety-two times on entry documents over the course of the project.

On April 19, 1984, the Hitachi America official in charge of the MARTA project at that time accompanied by an official from Hitachi Japan visited Customs' office in Savannah, Georgia in order to discuss the MARTA importations. At trial, neither of these gentlemen could recall whether they discussed the EPA and MVA clauses or whether they provided a copy of the MARTA contract and the Hitachi America–CIJ purchase order to the Import Specialist. It is routine for National Import Specialists to request copies of contracts on long-term projects and to inquire about any escalation provisions contained therein. Hitachi America's customs brokers also held meetings with Customs in Savannah to discuss invoicing issues. It is unknown whether the customs brokers discussed invoicing or reporting requirements for EPA or MVA with the Savannah Import Specialist. After these meetings with Customs and some minor internal investigations, Hitachi America proceeded on the assumption that escalation clauses need not be listed on the invoice submitted to Customs and that any additional duties arising from escalation payments could be reported and paid at the end of the project. Although some of the Savannah Import Specialists involved in the pre-importation meetings were apparently available to testify, the government failed to produce any witnesses from the Savannah Customs office or the office of the National Import Specialist to testify as to whether there were discussions regarding the EPA and MVA provisions expressly referenced in the CQ–311 contract. The first importation of unfinished subway cars entered Savannah on June 16, 1984. The last of the forty-one entries at issue in this case was entered on June 29, 1988.

In 1986, due to the Plaza Accords which uncoupled the world's major currencies, the dollar depreciated precipitously against the yen. The depreciation of the dollar resulted in substantial MVA payments by MARTA to the joint venture. The hapless MARTA, which apparently failed to hedge in the futures market against potential currency fluctuations, became dissatisfied with this increased expense and refused to pay on MVA invoices for some time. This led to the filing of a lawsuit by the joint venture against MARTA which was eventually settled. During the middle of the project, Hitachi America began to analyze duty payments on the MARTA contract both to discover whether customs laws had been complied with and to ensure that the correct amount of duty would be tendered to Customs upon the completion

of the project. Although EPA was understood to be dutiable, there were considerable questions regarding the dutiability of MVA. Some questioned whether MVA was dutiable based on the fact that yen was being received by the Japanese parties: MVA had no impact on the amount of yen received by CIJ or Hitachi Japan. The internal investigations produced no changes in how Hitachi America responded to its obligations under customs laws.

In late 1987, as the MARTA project began to wind down, Hitachi America began considering how to calculate escalation duties and to pay Customs. By January 1988, defendants realized that Hitachi America might have to pay additional duties on MVA as well as on EPA. In April 1988, after considerable negotiations between Hitachi America and Hitachi Japan concerning which company's budget would be used for the additional duty expenses, Hitachi Japan agreed to allocate $600,000 to Hitachi America to cover the expected amount of additional duties. Later in 1988, Hitachi Japan indicated that it was eager to resolve the duty matter as quickly as possible. Before paying any additional duties whatsoever, Hitachi America sought to confirm whether MVA was in fact dutiable. In the spring of 1988, Hitachi America finally retained outside counsel to determine whether MVA was dutiable. After determining that MVA was "potentially reportable", outside counsel advised Hitachi America not to tender EPA and MVA duties until the exact amount of duty on MVA payments had been calculated. This calculation was delayed because CIA refused to provide information requested by outside counsel showing the amounts CIA had paid to CIJ for the imported merchandise.

Ms. Crecco was the lay employee at Hitachi America who designed customs compliance programs at Hitachi America in the mid to late 1980's. Originally hired for clerical work in February 1984, she became a rising star in the company and received the highest awards for her performance. She worked with her future husband, Mr. Long, to design customs compliance programs and in 1986 she became the manager of the newly created Hitachi America Import/Export De-

partment; in that capacity, she developed customs compliance programs and communicated with Customs regarding duty issues. Despite her responsibilities, Ms. Crecco was not effective in resolving the EPA and MVA duty issues before she left Hitachi America in July 1988. Instead, Ms. Crecco, who had contemplated becoming a Customs informant and collecting a moiety award for her services as early as 1986, became a government informant in March 1988. Ms. Crecco had been advising Hitachi America not to contact Customs in 1987 and 1988 in connection with the EPA and MVA duty issues, and in the summer of 1988, she delayed sending documents to outside counsel which were required to calculate those duties. At the same time, Ms. Crecco passed many internal Hitachi America documents to Customs agents investigating the MARTA project, including legally privileged information. After her departure from Hitachi America, Ms. Crecco arranged a lunch date in November 1988 with Ms. Hansen (then Ms. Wilson), a Hitachi America employee still involved in the MARTA duty issues, in order to surreptitiously record admissions. Ms. Wilson related that outside counsel was in the process of finalizing his analysis and that "[Hitachi Japan] is ready to pay." In June 1988, outside counsel requested records of payments to Japan for the imported merchandise. Hitachi America tried on several occasions and by various means to obtain the payment information kept by CIA. CIA failed to provide that information to Hitachi America and allegedly suggested that it "let sleeping babies lie." Through Ms. Crecco's services, Customs became aware that Hitachi America was planning to make a prior disclosure, and Customs exercised a search and seizure warrant on Hitachi America's headquarters on April 4, 1989. A grand jury was convened to investigate criminal fraud but failed to indict. In 1991, Hitachi America paid $851,385 in response to the Pre–Penalty Notice issued by Customs.

The complexity of the EPA and MVA duty issues is substantial. Before and during this trial there was significant disagreement within the government over how to appraise the entered merchandise and determine the amount of lost duties. In December 1990, the government performed an audit which

determined that the joint venture received an aggregate of $20,448,989 in unreported escalation payments from MARTA, roughly $2,000,000 of which was due to EPA and the remainder to MVA. This initial audit determined that the dollar denominated lost duties on those unreported payments equaled $851,455. The government performed a supplementary audit in 1994 to include contract modifications left out of the initial audit, and the supplementary audit determined that aggregate escalation payments from MARTA equaled $22,766,284, resulting in an additional $96,399 in lost duties. Combining the $851,455 from the initial audit and the $96,399 from the supplementary audit equals $947,854 in lost duties. Based on this dollar theory of valuation, the total value of the entries was $63,054,536, but by not reporting MARTA's escalation payments, Hitachi America reported an aggregate entered value of only $40,288,252. For years, the government proceeded on the assumption that MARTA's dollar payments to the joint venture established the correct measure of lost duties. On the eve of trial, the government undertook an alternative calculation it presented to the Court based on the assumption that the relevant transaction might be represented by payments in yen from CIA to CIJ, resulting in a loss of revenue of $750,536. This figure was revised during trial on June 3, 1996 to equal $632,102. Finally, the government's appraisal expert testified on June 6, 1996 that over the previous weekend he underwent a last-minute "crystallization" of thoughts which convinced him that the government's original calculations based on MARTA's dollar payments to the joint venture should be utilized to calculate the amount of lost duties, and that $947,854 represented the correct measure of lost duties. After 7 years of investigation and prosecution, substantial intra-government disagreement remains over the core issues.

On June 29, 1993, the government filed suit; this was one day before the defendants' waivers to a statute of limitations defense expired. Nearly seven weeks of depositions were taken beginning in the fall of 1995, and several of those weeks were spent deposing witnesses in Japan. The trial, which began on May 7, 1996 after a several month extension granted upon the government's last minute request, spanned nearly six full weeks. The government identified sixty-eight binders of pre-trial exhibits and called eighteen witnesses. This litany of witnesses did not include any Customs employees involved in the pre-importation meetings or any other meetings with Customs. The defendants moved to dismiss the case after the close of the government's case in chief and the Court granted the motion on the counts alleging fraud and gross negligence. The defendants elected not to present a case.

With this skeletal background in place, the Court turns to its discussion of the issues. The factual determinations appearing in the discussion constitute additional findings of fact by the Court but have been deferred in order to achieve an orderly presentation of the ultimate issues.

## DISCUSSION

The government alleged in the alternative that Hitachi America and Hitachi Japan are liable for violating customs laws by committing fraud, gross negligence, or negligence, and that Hitachi Japan is also liable as an aider or abettor. The government's general argument is that a violation of the customs laws is a *per se* event, and is therefore punishable. Importers are required to disclose and report to Customs all information relevant to determining the dutiable value of merchandise. Escalation clauses such as EPA and MVA are material to determining the dutiable value of imported merchandise. Importers are therefore required (1) to disclose escalation clauses upon entry documents, and (2) to report escalation payments when they are received unless liquidation has been suspended or estimated duties have been deposited upon entry. When defendants entered the merchandise without specifically listing the escalation clauses on entry documents, they knew or should have known that they submitted materially deficient information relevant to the determination of dutiable value, even though none of the entry documents related to any particular payment, nor could they have done so. However, because they did not deposit estimated duties or arrange to suspend liquidation, they vio-

lat*e*d customs laws by not reporting escalation payments at the time they were received.

At the close of the government's case in chief, defendants moved for judgment or dismissal pursuant to Court of International Trade ("CIT") Rules 41(c) and 52(c). The Court granted the motion on the fraud and gross negligence counts but denied the motion with respect to the counts alleging negligence and aiding or abetting. The Court first addresses defendants' negligence and then articulates its reasons for granting defendants' motion under CIT Rules 41(c) and 52(c) on the fraud and gross negligence counts.

### I. *Hitachi America Committed Negligence*

The statutes allegedly violated include 19 U.S.C. § 1484 (" § 1484"), 19 U.S.C. § 1485 (" § 1485"), and 19 U.S.C. § 1592 (" § 1592"). Section 1484 requires that contract terms affecting the assessment of duties be disclosed on entry documents.[1] Section 1485 requires that importers immediately notify Customs of any transactions subsequent to entry that impact the correct price of the merchandise, and § 1592 creates liability for negligently submitting materially deficient pricing statements contrary to the directives of § 1484 or § 1485. Section 1592 sets forth the three bases of liability for customs penalty actions:

**(a) Prohibition**

**(1) General Rule**

Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby, no person by fraud, gross negligence, or negligence—

(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of—

(i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or

(ii) any omission which is material, or

(B) may aid or abet any other person to violate subparagraph (A).

For reasons which follow the Court holds that Hitachi America is liable for negligence under § 1592(a)(1)(A).

■ The penalty statute removes the breach element from the government's *prima facie* negligence case. Under the common law, the plaintiff's *prima facie* negligence case consists of demonstrating sufficient evidence of duty, breach, causation, and damages. In contrast, for simple negligence claims under the penalty statute, "[T]he United States shall have the burden of proof to establish the act or omission constituting the violation, and the alleged violator shall have the burden of proof that the act or omission did not occur as a result of negligence." § 1592(e)(4). By shifting the burden to the defendant to show lack of negligence, § 1592(e)(4) derogates from the common law. This burden-shifting provision applies to a negligence claim as well as to a claim for aiding or abetting because § 1592(e) applies to any proceeding commenced "pursuant to section 1604 of [Title 19]", which includes an aiding or abetting violation under § 1592(a)(1)(A). The burden-shifting provision also applies to a claim for aiding or abetting because, as explained *infra*, the basis of liability for aiding or abetting a negligent act is itself negligence.

■ In order to assess defendants' liability for negligent acts, the Court adopts the definition of negligence appearing in Customs' regulation:

A violation is determined to be negligent if it results from an act or acts (of commission or omission) done through either the *failure to exercise the degree of reasonable care and confidence expected from the person in the same circumstances in ascertaining the facts or drawing inferences therefrom, in ascertaining the offender's obligations under the statute*, or in com-

---

1. While the importer referred, on entry documents, to the underlying contract, CQ–311, it did not attach copies of that document nor recite the escalation provisions of CQ–311 on the entry documents.

municating information so that it may be understood by the recipient. As a general rule, a violation is determined to be negligent if it results from the offender's failure to exercise reasonable care and competence to ensure that a statement made is correct.

*Customs Service Revised Penalty Guidelines,* 19 C.F.R. pt. 171 App. B(B)(1) (emphasis added). *See also United States v. Rockwell Int'l Corp.,* 10 CIT 38, 43 n. 5, 628 F.Supp. 206, 211 n. 5 (1986) (quoting Customs' definition of negligence as authority for determining standard of care required under § 1592). Since § 1592 allocates the burden to show an absence of negligence (more technically an absence of breach) to defendants, the defendants bore the burden to show that they exercised reasonable care under the circumstances.

The government contends that had defendants exercised reasonable care in ascertaining their statutory obligations, they would have known of their obligations both to disclose escalation clauses on entry documents and to report future escalation payments at once. Fundamentally, defendants should have known of their disclosure and reporting requirements because they should have known that potential escalation payments are material to assessing the dutiable value of merchandise. With regard to the alleged disclosure violation, § 1484 provides in pertinent part:

> [An importer of record] shall file (at the time required under paragraph (2)(B) of this section) with the appropriate customs officer such other documentation as is necessary to enable such officer *to assess properly the duties on the merchandise*
>
> . . . .
>
> (2)(B) The documentation required under paragraph (1)(B) of this subsection with respect to any imported merchandise shall be filed with the appropriate customs officer *when entry of the merchandise is made* . . . .

§ 1484(a) (emphasis added). In order for a Customs official to assess properly the duties on merchandise, the official must be in possession of all information relevant to determining the dutiable value of the merchandise

pursuant to the valuation statute, 19 U.S.C. § 1401a (" § 1401a"). Under § 1401a, the preferred method for calculating dutiable value involves determining the "price paid or payable" for the merchandise. The government argues that since the price paid or payable included potential EPA and MVA escalation payments, then at the time of entry, Customs was deprived of information relevant to the proper assessment of duties and so defendants violated § 1484.

The duty to report escalation payments as they were received allegedly arose under § 1485, which provides in pertinent part:

> Every importer of record making an entry under the provisions of section 1484 of this title shall make and file therewith . . . a declaration under oath, stating—
>
> (2) That the *prices set forth in the invoice are true,* in the case of merchandise purchased or agreed to be purchased . . . ;
>
> * * *
>
> (4) That he will produce *at once* to the appropriate customs officer any invoice, paper, letter, document, or information received showing that any such *prices or statements are not true or correct.*

§ 1485(a) (emphasis added). The plain language of § 1485 obligates importers to report immediately to Customs any new information showing that the prices declared at entry were incorrect. The government argues that since escalation payments are part of the price paid or payable for the subway cars, then under the language of § 1485, defendants were obligated to report any escalation payments to Customs at once. Since they did not do so, and since they did not avail themselves of the statutory mechanisms allowing for the deferral of the reporting obligation, they violated § 1485.

The Court agrees with Hitachi Japan that because § 1484 and § 1485 by their terms apply only to importers of record, Hitachi Japan may not be held directly liable for a violation of these statutes: Hitachi Japan's liability may arise only via the aiding or abetting provision of § 1592. Although the government argued that Hitachi America was effectively controlled by Hitachi Japan,

the government did not argue or demonstrate that the Court should pierce the corporate veil and treat Hitachi Japan as if it were in the shoes of Hitachi America; on the contrary, the government chose to sue defendants separately and treated them throughout as separate entities.

### A. *Hitachi America Did Not Fully Comply With Customs Laws When It Declared Incorrect Dollar Amounts On The Entry Documents*

■ The starting point for the overall analysis of negligence with respect to MVA is deciding whether the payment from the joint venture to CIJ was a dollar or a yen transaction. The reason for this is that the terms of the transaction determine the currency terms which must be disclosed on the entry documents. In particular, § 1481(a)(5) requires the importer to list on the invoice "[t]he purchase price of each item *in the currency of the purchase . . .*" *Id.* (emphasis added). The government asserts that the transaction between the joint venture and CIJ was in dollars. Since the invoice between Hitachi America and CIJ was denominated in dollars, was submitted to Customs, and served as the basis upon which Customs appraised the merchandise, the government infers that the contracting parties treated it as a dollar transaction and the Court should do likewise. Under this theory of the case, Hitachi America properly listed dollar denominations on the entry documents but was negligent for not listing the MVA clause on the invoice and for not reporting MARTA's MVA payments upon receipt. Nevertheless, the government recognized that reasonable minds could differ on this issue and ensured that appraisal calculations founded on the yen transaction view were performed by its expert auditor and entered into evidence. Defendants maintain that the transaction between the joint venture and CIJ was in yen. As defendants explain,

> All of the parties agree now that the records taken by the Government from CIA (not previously available to Hitachi [Japan]

and [Hitachi America]) established that CIA, acting as the accountant on behalf of [Hitachi America] as part of the Joint Venture paid CIJ . . . in Japanese yen. In line with the exchange rate provision in the purchase orders between [Hitachi America] and CIJ, CIA had converted the dollar amounts shown on the purchase orders and CIJ invoices into yen using a constant exchange rate of 269.7 yen to the dollar. CIA then remitted the fixed payment in yen to CIJ, on behalf of [Hitachi America], regardless of the MVA amount CIA expected subsequently to recover from MARTA. Although CIA did later remit (also in yen) the additional EPA inflation escalation payments . . . to CIJ, it did not remit any additional MVA currency escalation payments to CIJ, since this transaction was already in yen.

Hitachi Japan's Post–Trial Br. at 33–34 (arguments "fully support[ed] and adopt[ed]" by Hitachi America (Hitachi America's Post–Trial Mem. at 21)); *See also* Hitachi America's Post–Trial Mem. at 18 ("[Hitachi America] received no separate invoices for MVA payments and the MVA clause did not change the value of the payments made to [Hitachi Japan] in Japan.") [2]

Since CIJ invoiced Hitachi America in dollars but was paid by CIA in yen, Customs' would normally view this arrangement as constituting a yen transaction:

> Sellers and buyers occasionally specify a pegged rate of exchange which will apply to the sale of the goods. The pegged rate of exchange should be used only in determining which currency is the true currency of the transaction.

> For example, if merchandise from Japan is invoiced in yen, but payable in U.S. dollars at the rate of $1 for 250 yen, then the transaction is in dollars. *Conversely, if the merchandise from Japan is invoiced in dollars, but payable in yen at the rate of 250 yen for $1, then the transaction is in yen.*

Fundamentals of Customs Tariff and Trade Operations 7–8 (1983) (emphasis added). On

---

**2.** Thus, because CIA invoiced MARTA for MVA payments but CIJ did not invoice Hitachi America for MVA payments, there was no illegal dou-

ble invoicing for MVA in violation of 19 U.S.C. § 1482(b).

June 6, 1996, the government put on Mr. Wholey, a surprise witness allowed by the Court, as an expert in Customs appraisement matters. On direct examination, Mr. Wholey testified that in his view, the transaction between the joint venture and CIJ was a dollar transaction. Mr. Wholey explained that although he stated during his May 23, 1996 deposition that the transaction was in yen, over the weekend before his testimony at trial his view underwent a crystalline transformation and he was now thoroughly convinced that the transaction was in dollars and that the appraisal of the merchandise should be based on the dollar amounts MARTA paid to the joint venture.

On cross examination, Mr. Wholey admitted that prior to his deposition he had expressed his opinion to the Justice Department that the transaction was in yen. Mr. Wholey was asked about a file provided to him by the Government to help him prepare for his expert testimony. Included in the file was a proposed draft of a brief on this case authored by a senior Customs attorney and an associated e-mail. Mr. Wholey stated that those materials made him aware that senior Customs attorneys as well as the chief of the Customs Penalties Branch believed that the transaction was in yen. He also testified that he agreed with Customs' view that since CIA did not send additional payments to CIJ for MVA receipts, MARTA's MVA payments to the joint venture would have been irrelevant for duty purposes if Hitachi America had properly listed on the invoice the fixed amount of yen that CIA sent to CIJ. On redirect examination, Mr. Wholey testified that he suddenly fell ill during his May 23, 1996 deposition and that he was thereby distracted, weakened, and tired at the time he expressed his opinion that the transaction was in yen. He also stated that when he originally received the file, he read the e-mail but not the draft brief prepared by Customs, and that none of the materials attached to the e-mail had influenced his testimony at trial.

■ The Court finds that the transaction was in yen and that Hitachi America negligently listed an incorrect dollar denomination as the currency of purchase on the entry documents in violation of § 1481(a)(5). The currency of purchase is a material element because it is explicitly required by statute and is an essential element to calculating dutiable value. The Court accords great weight to Customs' published fundamentals on the method for determining the currency of purchase. Although the Court sympathizes with Mr. Wholey's sudden illness at deposition, it must dismiss his last minute apostatic opinion as caprice. From the time the government solicited his expert opinion until the weekend before trial, Mr. Wholey was convinced that the transaction was in yen. That was the correct view according to Customs' routine interpretation. It also comports with common sense: CIA paid CIJ in yen. Moreover, as discussed *infra*, even if the valuation of the merchandise were ultimately based on a dollar transaction by virtue of the provisions of the valuation statute, that does not impinge the command of § 1481(a)(5) requiring the importer to list the purchase price in the actual currency of purchase. In their zeal to argue for the lower amount of lost duty which a yen transaction theory produces, defendants are magnanimously forthcoming with the asserted legal implications. If the transaction between the joint venture and CIJ was in yen, the government would have a claim for

> the mistaken treatment of the transactions on the entry documents as dollar-based, rather than yen-based transactions. [This] claim has not previously been asserted by the Government as a violation, would not properly be before this Court, and in any event, is answered by the undisputed evidence that Hitachi [Japan] and [Hitachi America] legitimately believed the transaction was dollar-based and did their best to obtain the correct information and documentation from CIA.

Hitachi Japan's Post–Trial Br. at 35–36 n. 26 (arguments "fully support[ed] and adopt[ed]" by Hitachi America (Hitachi America's Post–Trial Mem. at 21)). On the contrary. The government asserted in its opening argument that the finding of a yen transaction would render the dollar denominations on the invoices false statements. Second, the trial was conducted *de novo* and the Court is unfettered in its discretion to identify viola-

tions of law. Third, even if it were true that Hitachi America did not know that CIA was remitting yen, the fact that Hitachi America might have been forced into a marriage of convenience with CIA does not permit it to rely conveniently on internuptial shenanigans as proof of reasonable care.

If a domestic joint venture bifurcates its banking and customs operations, the importer of record will be hard pressed to explain its failure to obtain basic information from its partner essential to compliance with customs laws. Furthermore, the Court wonders whether Hitachi America was ignorant that CIA was remitting yen when the evidence demonstrates that the two communicated with each other during the course of the importations. It does not follow from the fact that Hitachi America was unable to obtain payment records from CIA in 1988 that Hitachi America was not aware that CIA was remitting yen throughout the course of the project; to wit, a Hitachi America internal memorandum from February 1988 stating, "Some people feel the increase in contract amount and *the way money is transferred back to Japan,* makes MVA dutiable." (emphasis added). In a similar vein, the Court dismisses defendants' argument that CIJ controlled the preparation of the faulty commercial invoices as a futile blame shifting maneuver. Hitachi America is responsible for the contents of the invoice under the statute and absent proof of legal coercion, which was neither alleged nor proved, it may not dodge its obligations as an importer of record by pleading impotence. The government tried its case under the dollar theory. Defendants chose not to put on a case and in electing that strategy, they were confined in cross examination to refuting the dollar theory. There is scant evidence that Hitachi America was in fact ignorant of the fact that yen was being sent abroad or that it attempted to so discover. A bald assertion that Hitachi America "legitimately believed" dollars were being sent abroad hardly suffices. Its obligation was to declare the true currency of purchase. It did not declare the true currency of purchase and failed to show that

it exercised reasonable care in ascertaining the relevant facts about the transaction. Hitachi America violated § 1481(a)(5) by stating an incorrect currency of purchase and was negligent in doing so. Notwithstanding this, the Justice Department was never able to agree with the correct view of the Customs Service that the transaction was in yen. It follows that if, over the years, Treasury (Customs) and Justice could not agree on the actual currency of the transaction that confusion on the part of the importer and its partners, while not entirely excusable, is at least understandable.

██ It follows from this discussion that Hitachi America negligently violated its obligations under § 1484 and § 1485 to declare accurately the price of the merchandise. Hitachi America understated the price of the merchandise because the dollar amounts it listed on the entry documents understated the value of the yen sent abroad—even though, as noted above, the entry documents did not and could not reflect the actual price of each shipment.[3] Ascertaining the *amount* of currency sent abroad is just as basic to complying with customs laws as is ascertaining the type of currency sent abroad. Hitachi America failed to show that it exercised reasonable care to discover the amount of currency that was sent abroad for the same reasons that it failed to show that it exercised reasonable care to discover the type of currency that was sent abroad. The Court holds that Hitachi America negligently declared prices which, cumulatively understated the value of what was paid to the foreign seller.

The Court agrees with the government's client, Customs, that MARTA's MVA payments were irrelevant for duty purposes and therefore Hitachi America may not be held liable for failing to disclose the MVA clause on entry documents or for failing to report MVA receipts at once. If the transaction had been in dollars, then, akin to the Court's holding under its analysis of EPA, Hitachi America would have negligently failed to report the MVA payments as they were received.

---

**3.** The understated yen amount would equal the dollar value declared on the entry documents times (269.7 yen to the dollar minus the yen to

dollar exchange rate prevailing on the day the subway cars were shipped). See 31 U.S.C. § 5151 and 19 C.F.R. §§ 159.31–159.38.

### B. *Hitachi America May Not Be Penalized For Failing To Disclose The EPA Clause On Entry Documents*

■ Defendants argue that as a matter of logic and law, omitting references to escalation clauses on entry documents could not constitute a materially deficient statement actionable under § 1592. Potential escalation payments are not material because they are uncertain at the time of entry; in fact, it is possible that no escalation payments might be disbursed whatsoever due to an equilibrium of escalation indices; over time, an importer might even receive a lesser flow of currency from the purchaser if escalation operates to its translational detriment. Since the amount of escalation cannot be established at entry, escalation clauses cannot be material price terms as a matter of law. This argument is not entirely persuasive. Contingent payments may be material to the value of merchandise for the same reason that they are material to valuing a going concern.

The government argues that escalation provisions are material to the price of merchandise at entry as a matter of law and therefore must be disclosed in the entry documents. The Court agrees. Several cases have held that the issue of materiality is a matter for the Court. " '[T]he measurement of the materiality of the false statement is its *potential impact* upon Customs' determination of the correct duty for the merchandise.' *United States v. Rockwell International Corp.*, 10 CIT 38, 628 F.Supp. 206, 210 (1986) (DiCarlo, J.). That measurement of materiality would also apply to a false statement by omission." *United States v. Menard*, 16 CIT 410, 417, 795 F.Supp. 1182, 1188 (1992) (emphasis added). All parties agree that EPA payments affect dutiable value, so Hitachi America omitted referencing an item that had a potential impact on the correct duty and thus perpetrated a material omission. Nevertheless, the Court may not penalize defendants on this basis because the duty to report escalation clauses on entry documents was rendered turbid by a Customs ruling published in the Customs Bulletin [4].

The government presented one Customs ruling published in the Customs Bulletin which concludes that escalation is part of the price of the merchandise at entry. In C.S.D. 82–121 (March 15, 1982), 16 Cust. Bull. 913 (1982), the importer requested a ruling on whether escalation receipts were considered part of the price of merchandise valued under the transaction value provision of the valuation statute and if so, how should the importer account for potential escalation receipts in calculating the correct amount of estimated duties to deposit upon entry. Customs ruled:

> Concerning the escalation provisions in the contract, it is our opinion that where, as here, the formula for determining the escalation amounts was arrived at prior to the importation of the merchandise, *the escalation payments attributable to the dutiable portions of the contract price should be taken into account in calculating the price paid or payable. This is true even though the final and precise determination of the escalation amounts will not be known until some time after the shipment has arrived.* Of course, as you point out, 19 U.S.C. 1504(a) provides for a one-year limitation on the time within which to withhold liquidation on an entry, unless an extension of the time limit is granted pursuant to section 1504(b). . . .
>
> In regard to the amount to be deposited as estimated duties, we recognize that the final amount of the escalation payments will not be known at the time of entry. Therefore, we have no objection to a deposit of estimated duties based on the contract purchase price . . .

*Id.* at 914. (emphasis added). The ruling states that potential escalation payments are to be considered part of the purchase price but that estimated duties equal to the contract price may be deposited upon entry in anticipation of future corrections. The government also located several rulings not published in the Customs Bulletin which concluded unsurprisingly that escalation payments are part of the price of the merchandise. HQ 543917 EK (Aug. 27, 1987); HQ 543089

---

**4.** In fact the importer referenced CQ–311, the underlying contract containing the escalation clauses, more than ninety times on the entry documents.

CW (June 20, 1984); HQ 543252 MK (Mar. 30, 1984); HQ 543285 MK (Mar. 20, 1984); HQ 542975 (Mar. 9, 1983). If potential escalation payments are part of the price of the imported merchandise, then § 1484 would seem to require that escalation clauses be disclosed on the entry documents; the required specificity of such disclosure is not articulated.

 Defendants do not deny the dutiability of EPA, but argue that there is no requirement to recite specifically escalation clauses on the entry documents. In support of their argument, they point to a Customs decision published prior to the first MARTA entry and subsequent to C.S.D. 82–121. In C.S.D. 84–78 (March 30, 1984), 18 Cust. Bull. 1030 (1984), which involved the duty consequences of *decreased* payments to the seller by virtue of refunds pursuant to currency fluctuation adjustments, Customs stated that "if the manufacturer and importer have agreed upon a formula under which to arrive at the price actually paid or payable, the importer should advise the appropriate Customs officer, *preferably* at the time of entry." *Id.* at 1032 (emphasis added). At trial, the government dismissed this ruling as mere "*dicta*" and attempted to distinguish it on the grounds that it involved a decrease in the price deemed paid rather than an increase. This explanation misses the point. In its discretionary function Customs fills out the law, most authoritatively by rulings published in the Customs Bulletin. In a strict sense all Customs rulings are *dicta* because they are not binding on the Court.

Regardless of whether Hitachi America actually relied on this ruling and in the absence of subsequent rulings expressly requiring disclosure of escalation clauses upon entry, C.S.D. 84–78 clouded the existence and exigency of the requirement, and a nebulous duty is a legal oxymoron. "[W]here the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulation, and may not be punished." *General Electric Co. v. EPA*, 53 F.3d 1324, 1333 (D.C.Cir. 1995). *General Electric Co. v. EPA* held that the agency was free to enforce its interpreta-tion of the statute, but that imposition of a penalty was precluded by the Due Process Clause. *Id.* at 1334. *See also Lloyd C. Lockrem, Inc. v. U.S.*, 609 F.2d 940, 944 (9th Cir.1979) ("We reiterate that [one] should not be held to standards, the application of which cannot be agreed upon by those charged with their enforcement"). Since the conflicting rulings published in the Customs Bulletin did not put importers on notice of what conduct was required, to penalize Hitachi America for its alleged violation would run afoul of the Due Process Clause of the U.S. Constitution. "Engrained in our concept of due process is the requirement of notice.... Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act." *Lambert v. California*, 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957). Had the government called a witness from Customs to testify on its behalf, perhaps it could have rehabilitated the clear implication of C.S.D. 82–121 by showing that actual Customs practice required disclosure. The Court holds that importers are required to disclose escalation clauses in entry documents but that Hitachi America may not be held liable because Customs confused the obligation by virtue of its own published rulings.

**C. *Hitachi America Is Liable For Negligently Failing To Report EPA Payments At Once***

 The Court does hold Hitachi America liable under § 1485 for negligently failing to report EPA payments as they were received. Section 1485 obligates importers to report "at once" any receipts showing that the price declared on the invoice was incorrect. If an importer wishes to avoid this duty, there are two simple statutory mechanisms at its disposal. First, an importer may arrange to hold open liquidation under 19 U.S.C. § 1504(b): "The Secretary may extend the period in which to liquidate an entry by giving notice of such extension to the importer ... if ... the importer ... requests such extension and shows good cause." *Id.* Second, as illustrated by C.S.D.

82–121, an importer may deposit estimated duties and when the merchandise is liquidated "[t]he appropriate Customs officer shall collect any increased additional duties due or refund any excess of duties deposited as determined on a liquidation or reliquidation." § 1505(b).

Defendants do not contest the dutiability of EPA but counter that because the final amount of escalation cannot be determined until the end of the project, "at once" for long-term importations means after completion of the contract. This argument is the logical extreme of the position already rejected by the Court and countered by C.S.D. 82–121 that uncertain escalation payments cannot be material to the price at the time of entry as a matter of law and logic. To indulge the argument, the position that escalation payments can only be material to the price of imported merchandise when the aggregate becomes known does not comport with common sense. Take MARTA's MVA payments as an example. Assume for a moment that CIA was remitting dollars to CIJ so that MVA payments were part of the price of the merchandise. The joint venture received over eighteen million dollars in MVA payments. Much of that money was accumulated long before the end of the project. It is pure vagary to maintain that sums certain are not material until the cumulative certainty has materialized. Surely a putative investor in the joint venture would rely on the accumulated amount in making investment decisions. EPA payments are material to the price of merchandise and must be reported at once to Customs absent alternative arrangements pursuant to statute.

Customs rulings uniformly state or entail that uncertain escalation payments are material to the price of the merchandise, giving notice to importers that they must report escalation receipts at once unless liquidation has been suspended or estimated duties have been deposited. C.S.D. 82–121 concludes that escalation payments are part of the price of merchandise and permits a deposit of estimated duties based on the contract price; it does not permit the importer privately to run a tally and pay the aggregate in the end, but envisages an adjustment to the dutiable value when the adjustment amount applicable to the entry becomes known. Even defendants' claimed reliance on C.S.D. 84–78 declares that "transaction value will be represented by the price actually paid or payable, to be established by *corrected invoices . . . ." Id.* at 1032 (emphasis added). Now, even if Customs allowed a lowering of the dutiable price in C.S.D. 84–78 despite the importer's failure to disclose the escalation clause upon entry, to interpret the ruling as permitting the importer to run a tally of adjustments over several years and announce the aggregate at the end is not a fair reading. The fair reading is that importers must deliver corrected invoices, or as here, when the invoices can never be accurate, some other notification to Customs should be made when the importer discovers the amount of the adjustment.

Defendants cite the following example in a futile attempt to identify a published Customs' position announcing that EPA may be paid at the end of a long-term project:

Q. The merchandise undergoing valuation is a partial shipment of a larger order against a long-term contract, containing escalation clauses that will not be finalized until the contract is completed. How would the price actually paid or payable be determined for the merchandise being appraised?

A. *Keeping in mind the requirement for one-year liquidation, appraisement could be withheld until the amount actually payable (after completion of the contract) could be determined.* Current practice in such situations is about the same.

Department of the Treasury, U.S. Customs Service Office of Commercial Operations, *Customs Valuation under the Trade Agreements Act of 1979* 78 (1981) (emphasis added). As the government points out, the example contemplates payment within the normal liquidation period. Were this not so, the Court would be compelled to hold that the duty to pay at once was nebulous and Hitachi America could not be penalized for accumulating EPA without reporting to Customs. However, the plain language of § 1485 combined with Customs' published rulings put importers on notice that escala-

tion payments must be reported at once unless other arrangements have been made. Hitachi America violated § 1485 by not reporting escalation payments upon receipt.[5]

 Once the violation was established, Hitachi America had the burden to show that it exercised reasonable care under the circumstances to ascertain its statutory obligations. Defendants argue that the evidence confirms Customs' acquiescence in their alleged past practice to pay EPA at the end of long-term projects. Were this true, it would be evidence tending to show that Hitachi America acted reasonably under the circumstances because it may have been lulled into a belief that reporting EPA at the end was acceptable under Customs' practice. However, the Court is not persuaded that the events cited actually rose to the level of a "past practice". Before delivering its analysis on that issue, the Court remarks that even if there were such a past practice, it would not operate to *estop* the federal government from enforcing the statute. Despite the harsh consequences, the federal government is not estopped to enforce laws against citizens who were advised by government officials that their actions were legal when the government later ascertains that such actions were not in compliance with the law. *OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990); *Melex USA, Inc. v. United States,* 19 CIT ——, 899 F.Supp. 632 (1995).

To support the allegation of a past practice, defendants point to a 1989 exchange between Hitachi America's Import/Export Planning Manager and the San Francisco District Director of Customs. The Import/Export Department Manager, who was in charge of customs compliance, wrote to the District Director in order to make a "voluntary tender" of duties on currency escalation adjustments remitted by Hitachi America to Hitachi Japan in connection with a multi-year project. Attached to the letter is a list of entries involved, some which had liquidated and some which had not, and a column showing the entries upon which addi-

tional duty was tendered. The District Director accepted the check for the duties and replied that the sum remitted "does *not* need to be a prior disclosure." (emphasis in original). If it had been considered a prior disclosure under § 1592(c)(4), Hitachi America would have been liable for penalties under that section up to two times the amount of lost duties for fraudulent retention of the duties owed or for interest if gross or simple negligence were involved. No one with personal knowledge of the exchange testified, and the document speaking for itself says little about a past practice to pay EPA duty at the end of projects. The document indicates that not all of the entries involved in the project had liquidated. All that the document and the reply from Customs show with certainty is that on one occasion, a District Director communicated to Hitachi America that a tender of EPA, other than at the time of entry, during the course of a project was not actionable, under the voluntary disclosure provision. Defendants chose not to call a witness to testify regarding the circumstances of this event, and the Court will not infer anything more than what is implied by the document. Defense counsel did exact testimony from Ms. Crecco, the former Import/Export Department Manager, that the form of the letter to Customs was similar to the form of letters she composed when she made other voluntary tenders.

A document in evidence shows that Ms. Crecco herself made a voluntary tender of EPA duties on behalf of Hitachi America in August 1985 and she testified Customs had not sought penalties under the prior disclosure provision in connection with those withheld duties. Defense counsel pursued Ms. Crecco's history of making voluntary tenders of EPA during her employment with Hitachi America:

Q. And during the course of your professional activities at Hitachi America, you did in fact make voluntary disclosures, didn't you?

---

5. The fact that the 250 milestone payments could not be directly correlated to entries does not influence the analysis. Importers may not avoid

their obligations under the law by structuring transactions so that payments do not correlate to entries.

A. I made—I made voluntary tenders of duty along the lines we have just discussed, such as the EPA types.

Q. In fact, is it fair to say that every voluntary disclosure you made at Hitachi America involved EPA, to the best of your recollection?

A. I'm not so sure about that, Mr. Assaf.

\* \* \*

Q. And in any of the voluntary disclosures that you were involved in ..., did Customs ever tell you that Hitachi America was engaged in fraud?

A. I don't think so, no.

Tr. 2316–17. Now it is clear from this testimony and Ms. Crecco's August 1985 letter to Customs that she made plural voluntary tenders of EPA to Customs without adverse consequences. However, the ambiguous documents from 1989 discussed above, Ms. Crecco's testimony that there were incidents in which she made voluntary tenders of EPA without adverse consequences, and the parade of Hitachi officials testifying about a past practice of which they had no personal knowledge do not imprint the canvas with sufficient points of reference from which the Court may extrapolate a pattern of conduct establishing a "past practice". The conclusion which follows is that defendants did not demonstrate a state of mind such that a belief in the acceptability of their conduct is the only circumstance under which Hitachi America's exercise of reasonable care should be analyzed.

█ The evidence demonstrates that Hitachi America was negligent by failing to exercise reasonable care in ascertaining its duties to report EPA. Internal corporate documents sent between Hitachi America and Hitachi Japan in 1984 before the first entry show Hitachi officials expressing the opinion that although EPA was subject to duty, in other long-term projects the base price was listed on the commercial invoice and additional duty was paid later without objection by Customs. In responding to a February 1984 telex from Hitachi Japan suggesting that it was permissible to list the base price on the invoice, Mr. Toda, the Hitachi America official in charge of the

MARTA project at that time, replied that in past projects the base price was listed "and the escalation portion must have been dealt with at the time of duty liquidation." Mr. Toda testified that he understood liquidation procedures at the time he sent this telex, but thought that EPA was dutiable at the end based on Hitachi America's prior experience in long-term projects. Notwithstanding his familiarity with liquidation procedures and his knowledge that EPA was dutiable, Mr. Toda failed to arrange for suspended liquidation of the MARTA entries in 1984. Mr. Toda apparently had some understanding of what mechanisms to pursue in order to resolve customs issues. For example, just prior to the MARTA entries, Mr. Toda resolved the problem of inconsistent F.O.B. prices appearing on MARTA project entry documents by consulting the Savannah and Chicago offices of the Customs Service, a customs broker, and the Hitachi America legal department. Yet Mr. Toda declined to consult these same resources regarding his imminent awareness of the EPA reporting issue and instead turned to Ms. Crecco for advice, an employee hired in February 1984 who was in charge of customs compliance programs.

In a report written in 1984 before the first MARTA entry, Ms. Crecco advised Mr. Toda that he should (1) arrange for suspended liquidation or (2) deposit estimated duties. Initially, Mr. Toda accepted Ms. Crecco's advice and decided to deposit estimated duties. He sent Ms. Crecco's memorandum to Hitachi Japan and stated "Please find enclosed a memorandum issued by our legal group[sic] about duty liquidation. [Hitachi America] will take up the second option for the project." In mid-April, Mr. Toda held a discussion with an official from Hitachi Japan and reversed his initial decision to deposit estimated duties. Mr. Toda testified that he had no recollection about why he changed his mind. The government argues that by not following Ms. Crecco's advice he rejected advice from Hitachi America's legal department. Ms. Crecco was communicating at that time with Mr. Long, in-house counsel at Hitachi America and her future husband, and copied him on her memo. Ms. Crecco testified that at the time, she was working with

Mr. Long on developing a customs compliance program. However, Ms. Crecco's interface with a member of the legal department does not enshrine her as legal counsel. In any case, it was not Mr. Toda's failure to follow Ms. Crecco's advice but rather his failure to consult Customs officials, customs brokers, or *bona fide* legal counsel from within or without Hitachi that compels the Court to conclude that he did not exercise reasonable care.

Mr. Toda did follow Ms. Crecco's advice to meet with an Import Specialist in Savannah, Georgia to discuss the imminent importations. This meeting took place on April 29, 1984 in Savannah. In such pre-importation meetings involving long-term multiple-entry projects, it is routine for Customs to request copies of the purchase order or underlying contract and to inquire about any escalation clauses. The record of this case shows that the files generated from these Savannah and subsequent meetings regarding the contents of the commercial invoice were destroyed by the government *after* it commenced its investigation of the MARTA project. The government proffered no reason for this clearly suspicious behavior. Mr. Toda was unable to recall any specifics of the meeting and the government did not call as witnesses any Customs officials who had been involved in those meetings.

Mr. Taga replaced Mr. Toda and became responsible for the MARTA project in early 1985. Mr. Taga testified that he was generally familiar with liquidation procedures at the time. He became aware that the MARTA project involved EPA payments almost immediately because one of his first assignments was to draft a purchase order to CIJ which included references to EPA. In the summer of 1985, Ms. Crecco wrote her letter announcing the voluntary tender of withheld EPA on another major Hitachi America program called the Fairfield Big Rivers Project. In her letter, Ms. Crecco wrote:

> At the time of entry [in 1982], [Hitachi America] had not been billed for the escalation amount owed to [Hitachi Japan] and was also not aware of the requirement to advise Customs of a pending increase in transaction value. These requirements

have now been informed to responsible [Hitachi America] personnel so that appropriate entry procedures can be followed for future entries.

The government argues that Mr. Taga was the supervisor of the Fairfield Big Rivers Project, and thus he was one of the people Ms. Crecco "informed". There are two problems with this argument. First, the evidence did not demonstrate that Mr. Taga received or read the letter or actually was informed by Ms. Crecco; Mr. Taga's stamp was not on the memo and he testified that he had never seen the letter before it was produced to him at trial. Furthermore, the letter only refers to the disclosure of escalation clauses, not the reporting of escalation payments.

In the spring of 1986, Mr. Taga became concerned about the fact that MARTA entries were liquidating and asked Ms. Hansen (who was Ms. Wilson at that time), a future Assistant Sales Manager of Hitachi America, to look into MARTA duty issues. Mr. Taga apparently wished to ensure that Mr. Toda had made all the proper arrangements to comply with applicable customs laws and that Hitachi Japan had allocated enough duty budget to Hitachi America to cover escalation duties. Ms. Hansen researched the issues and found that Mr. Toda had not arranged for suspended liquidation. She became convinced that Mr. Toda had committed an error: "The mistake that was made was at the time of the first importation, they did nothing to declare the contract and say we have an escalation clause in there, please keep the liquidation open until the whole contract is settled." Tr. 1589. Ms. Hansen memorialized her convictions in her April 21, 1986 weekly report which she shared with Mr. Taga:

> The actual procedure required by customs is that when an import is subject to escalation and MVA, customs is to be advised of this fact. Based on this information all entries relating to project would then be left open; not liquidated, until the project is complete and the price increase or decrease has been settled. Since this was not done, we need to determine what the actual value of the first fifty cars is and do

a catch-up payment to customs. At the same time advise them of our oversight/misunderstanding and that future shipments on this contract are subject to same terms. Once all information is received and analysis is complete, I will discuss our status and recommend action to be taken with all involved parties within [Hitachi America/Hitachi Japan].

Ms. Hansen, whom the Court found to be a credible witness, testified that she based these conclusions on advice from Ms. Crecco, who was by then head of the Import/Export Department in charge of Customs compliance. Ms. Crecco was coordinating her activities with her future husband Mr. Long, who himself was the in-house lawyer formally in charge of the MARTA project. Ms. Hansen testified that she was nevertheless informed by Ms. Crecco that Hitachi America need not change the way it was dealing with the MARTA importations. Ms. Crecco admitted that in the fall of 1986 she did not tell Ms. Hansen to go forward and report EPA payments to Customs. Ms. Crecco testified that in 1986, she had not contemplated becoming a Customs informant and collecting a moiety award; however, defense counsel read her deposition into the record in which she stated that she first contemplated taking that action "in the early 1986 time frame." Tr. 2330. Therefore, according to Ms. Crecco, at the time she advised Ms. Hansen not to change the procedures of the company vis-a-vis customs compliance, she already entertained visions of subordinating her duties to a potential monetary reward. Ms. Hansen testified that subsequent to writing her weekly report she learned from a different Hitachi America employee with experience on long-term projects that Hitachi America had paid EPA at the end of long term projects or when Customs sent information requests inquiring about escalation payments. In any event, Mr. Taga testified that although he read Ms. Hansen's report, he neither assigned in-house counsel nor retained outside counsel to investigate the issues.

Meanwhile, Mr. Long was also at work. *Sua sponte* he drafted a letter to Mr. Taga on October 16, 1986 citing C.S.D. 82–121 for the proposition that escalation payments were dutiable and stated that EPA payments from MARTA "have not been reported to U.S. Customs for duty payment purposes. This failure to report dutiable payments may be a violation of U.S. Customs law." In the letter Mr. Long also speculated that roughly $400,000 plus interest was owed to Customs and that Hitachi America should "negotiate with Customs with regard to moneys owed"; Mr. Long also advised that outside counsel should be retained to help resolve the issues. On the draft, which was not on Hitachi America letterhead, Mr. Long copied Ms. Crecco, Ms. Hansen, the President of Hitachi America, and the General Manager of Hitachi America. Mr. Long testified that Mr. Taga was furious that Mr. Long had copied senior management and ordered him to remove senior managements' names from the list of people copied. However, the draft does not bear Mr. Taga's stamp. The final letter of October 29, 1996, which is identical to the draft but for the removal of senior management from the list of people copied, does bear Mr. Taga's stamp; Mr. Taga testified that he then read the letter and became alarmed that someone from the legal department believed that Hitachi America had violated customs laws. Mr. Taga still did not retain counsel or make any inquiries to other knowledgeable sources.

Shortly after receiving Mr. Long's memorandum, Ms. Hansen suggested to Mr. Taga that he hire an attorney to investigate the duty issues. Ms. Hansen testified that Mr. Taga declined to do so:

> In substance, [Mr. Taga] conveyed to me that he would continue discussing with people in Tokyo to get them to understand the situation further and build the consensus towards getting to that step, that it was going to take a little longer, that we couldn't just hire the lawyer, there was no money, there was no understanding that there was an issue yet.

Tr. 1721. Ms. Hansen testified that she understood that the consensus building was required because of the large amount of money Hitachi Japan would have to allocate to Hitachi America to cover both EPA and potential MVA duties; at the time, Hitachi officials were uncertain whether MVA was dutiable. Mr. Taga could not remember ever

consulting legal counsel about the duty issues and testified that he relied on Ms. Hansen's advice because she was working with the legal department. Notwithstanding Mr. Taga's belief that Hitachi America's past practice was to pay EPA at the end, he was clearly on notice that there might be a problem with doing so. His failure to involve any knowledgeable sources persuades the Court that Mr. Taga acted negligently.

Ms. Hansen continued working on the duty issues for some time and in the summer of 1987, Mr. Yamasaki, the official from Hitachi Japan overseeing the MARTA project, met with Ms. Hansen. His report on the trip indicated he discussed the duty issues with Ms. Hansen and that Hitachi Japan would undertake a separate study of the issues. In his calculations of duty budget allocations for Hitachi America, Mr. Yamasaki had always included projected amounts to cover EPA and MVA duties. Near the end of 1987, Ms. Hansen discussed the issues with Mr. Hisada, who was scheduled to replace Mr. Taga in February 1988. Various officials from Hitachi Japan also attended that meeting, and in January 1988, one of them faxed Ms. Hansen and stated that Hitachi Japan understood it would have to pay any additional duty on EPA and MVA, and requested her to calculate the amount that would be due. Due to the large amount of MVA payments from MARTA, Hitachi Japan would have to allocate additional funds to Hitachi America to cover the liability.

In February 1988, Ms. Hansen prepared a memo entitled "Finalization of Duty Liability" at Mr. Hisada's request, noting that "the main concern at this point is to ensure that all obligations to U.S. Customs had been fulfilled by [Hitachi America]". One of the issues identified was that the dutiability of MVA had to be determined. Regarding EPA, Ms. Hansen estimated that $93,000 in duty would be owed on the entries that had already liquidated. Ms. Hansen memorialized that she had been informed by the Import/Export Department (*i.e.*, Ms. Crecco) that Hitachi America should not pay duty on EPA until the dutiability of MVA and the amount owed was resolved. Ms. Hansen recommended that the Import/Export Department should "work with a lawyer specializing in Customs matters" to determine the dutiability of MVA.

In the middle of March 1988, Mr. Hisada met with an official from Hitachi Japan to discuss the issues. It was confirmed that the $300,000 previously allocated to pay for duty could be used to pay duty on EPA and to hire a customs lawyer. On March 15, 1988, Ms. Crecco sent her letter to Customs' Office of Intelligence offering her services as an informant. She wrote:

I would like to have the opportunity to provide the Customs Service with information relating to the nonpayment of duty exceeding $1,000,000 and to make a claim for compensation as provided for in the above referenced regulation.

The merchandise involved has entered the United States at more than one port over a period of two years. For some time, the importer has been aware that the invoice value presented to Customs for the purposes of calculating the duty payable at each importation is significantly undervalued. Although company management has been advised of the implications of such an omission, it has decided not to proceed with corrective action....

I have made several attempts to communicate this issue to the Customs Service....

In late March, Ms. Hansen asked Ms. Crecco to recommend an outside attorney specializing in Customs matters. Two months later and after a message from Hitachi Japan declaring that it was "eager" to settle the issue, Ms. Crecco sent a letter to outside counsel but omitted sending crucial consumption entries that outside counsel required to determine the amount of duty owed. During this time Ms. Crecco was providing internal Hitachi America documents to Customs investigators. In June 1988, outside counsel advised that MVA and EPA were potentially reportable to Customs but counseled against disclosure until the dutiability of MVA and the amount were determined. In late June, the General Counsel of Hitachi America became involved and requested payment details from CIA which were not forthcoming. Hitachi officials testified that in a meeting with CIA officials CIA indicated it wanted to steer

clear of the problems and "let sleeping babies lie." CIA never provided the payment details and the government obtained them in a future search and seizure effort of CIA offices.

The last MARTA entry occurred on June 29, 1988, roughly a month after Hitachi America had retained outside counsel to deal with the duty issues. The Court finds that during Mr. Hisada's tenure, Hitachi America failed to exercise reasonable care to declare EPA payments until outside counsel was in fact brought in. This has no impact on the penalty base because the entry documents were inherently inaccurate in their own right as discussed above.

Ms. Crecco resigned from Hitachi America in July 1988, one year after Mr. Long resigned. In November 1988, Ms. Crecco arranged a lunch with Ms. Hansen and she (Crecco) secretly recorded the conversation on tape at the request of Customs. Ms. Hansen revealed to Ms. Crecco that Hitachi America was still addressing the duty issues and that the "factory [*i.e.*, Hitachi Japan] was ready to pay." In December 1988, Hitachi Japan informed Hitachi America that it was ready to allocate the precise amount of money needed to pay additional duties. In early 1989, outside counsel was attempting to calculate the duty owed by reference to the amount of money MARTA paid CIA since CIA was not forthcoming on what it remitted abroad. On April 4, 1989, before that amount was determined, the government executed a search warrant on Hitachi America. Two months later Mr. Long called the *Wall Street Journal* to announce the raid to the public. In his conversation with the newspaper, Mr. Long testified that he relayed facts he had gleaned during his employment as in-house counsel with Hitachi America. He had also relayed confidential information to Customs investigators in the fall of 1988. A grand jury was convened but, significantly, failed to indict for criminal fraud. In August 1991, before which time she had married Mr. Long, Ms. Crecco collected approximately $213,000 from the government as a moiety for her efforts. She signed a form when she collected the moiety on which form she acknowledged that the sum was taxable income. During their depositions in January 1996, the government learned that she and her husband had failed to declare that sum on their 1992 income taxes. On cross-examination, Mr. Long testified that in April 1992 they decided not to declare the moiety as income.

The conduct of the Longs entirely impeached their credibility as witnesses. Ms. Long was apparently stalling Hitachi America in its effort to resolve the duty issues at a time when she was in charge of customs compliance and she represented to Customs' Office of Investigations that Hitachi America officials intended not to pay duty when she knew that they were attempting to resolve the issues. Mr. Long may have breached his duty as a lawyer not to reveal confidential information to outside sources and appeared very uncomfortable on the witness stand. The pair also failed to pay taxes they knew they owed. Although the Longs' testimony cast aspersions on the integrity of many Hitachi officials and their intent to comply with customs laws, the Court finds neither of them credible. The facts even permit an inference that venality drove a mutual scheme to set Hitachi America up for illegal conduct.

■ Despite Ms. Crecco's inherent conflict of interest, the Court will not grant defendants' request that Ms. Crecco's letter to Customs be deemed a prior disclosure. The facts of the case will allow a court to determine whether the compliance official effected the violation, and the facts of this case show that she did not have the authority to compel compliance but only to monitor it; the managers of the MARTA project were aware of the problem and in control of the issue. For the purposes of the negligence analysis, the Court will not entertain an adverse inference arising from the government's egregious destruction of the pre-importation files that Customs approved Hitachi America's course of conduct, nevertheless the Court views with grave disapprobation such reckless conduct. Finally, Hitachi America did not show reasonable care by describing past projects where they waited for Customs to request information about EPA payments: absent depositing estimated duties or arranging for suspended liqui-

dation, the duty to report EPA at once is an affirmative one. Before closing this section, the Court notes that Hitachi America's interest in retaining the funds until the end of the project was minimal, other than its pure self-interest in the time value of money, and "[i]t is fundamental that the standard of conduct which is the basis of the law of negligence is determined by balancing the risk, in the light of the social value of the interest threatened, against the value of the interest which the actor is seeking to protect...." *Prosser on the Law of Torts,* § 32, at 149 (4th ed.1971). The social interest in compliance with laws, including customs laws, is paramount, and the utility of Hitachi America's conduct was minimal.

## II. *Hitachi America Did Not Commit Fraud*

The government alleged that Hitachi America committed fraud from the incipience of the importations in June 1984 throughout May 1987, a period comprising twenty entries. For claims alleging fraud, "[T]he United States shall have the burden of proof to establish the alleged violation by clear and convincing evidence." § 1592(e)(2). "Although not susceptible to precise definition, 'clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are "highly probable."'" *Buildex Inc. v. Kason Industries, Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988) (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 2437–38, 81 L.Ed.2d 247 (1984)). In order to demonstrate that Hitachi America committed fraud, the government bore all the burdens of proof. The government failed to show by clear and convincing evidence that defendants intended to defraud the revenue or otherwise violate the laws of the United States. Accordingly, when Hitachi America joined Hitachi Japan's motion for dismissal pursuant to CIT Rules 41(c) and 52(c) upon the close of the government's case in chief, the Court granted their motion with respect to fraud.

For the purposes of this case, CIT Rules 41(c) and 52(c) are equivalent grounds for defendants' motions. CIT Rule 41(c) declares:

*Insufficiency of Evidence.* After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant ... may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff.... If the court renders judgment on the merits against the plaintiff, the judgment shall be supported by either a statement of findings of fact and conclusions of law *or an opinion stating the reasons and facts upon which the judgment is based.* A dismissal under this subdivision (c) operates as a dismissal upon the merits, unless the court otherwise directs.

*Id.* (emphasis added). CIT Rule 52(c) declares:

*Judgment on Partial Findings.* If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter a judgment as a matter of law against that party with respect to a claim or defense that under the controlling law cannot be maintained or defeated without a favorable finding on that issue.... Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

*Id.* The analogous provision to current CIT Rule 41(c) was included in former Rule 41(b) of the Federal Rules of Civil Procedure ("FRCP"). The 1991 amendments to the FRCP transplanted the "insufficiency of plaintiff's evidence" ground from FRCP Rule 41(b) into FRCP Rule 52(c): "A motion to dismiss under Rule 41 on the ground that a plaintiff's evidence is legally insufficient should now be treated as a motion for judgment on partial findings as provided in Rule 52(c)." FRCP Rule 41 advisory committee's notes (1991 amendment). The Court of International Trade adopted the 1991 FRCP amendments into CIT Rule 52(c) but left CIT Rule 41(c) unchanged. This accounts for the substantial overlap between the purviews of CIT Rules 41(c) and 52(c) and renders them

alternative and equivalent grounds upon which a defendant may motion the Court for findings on the merits at the close of a plaintiff's case in chief. Although the Court acts pursuant to both applicable CIT Rules, the Court chooses to articulate its reasoning in opinion form as provided for under CIT Rule 41(c) rather than to make discrete findings of fact and conclusions of law pursuant to CIT Rule 52(c).[6] This Court has historically provided the opinion form as the avenue to address a CIT Rule 41(c) motion.

■ The cogitative process by which the Court decides CIT Rule 41(c) motions is described in jurisprudence developed under the analogous provision formerly contained in FRCP Rule 41(b). The Court of Appeals for the Federal Circuit explained the judge's role in addressing a motion to dismiss under former FRCP 41(b) based on the failure of plaintiff's evidence:

> [T]he trial judge in deciding such a motion in a nonjury case may pass on conflicts of evidence and credibility.... The trial judge ... may weigh and consider the evidence and sustain defendant's motion even though plaintiff's evidence establishes a *prima facie* case that would preclude a directed verdict for defendant in a jury case. Even assuming [plaintiff] had established a *prima facie* case on the merits, that would not preclude entry of judgment.... The district court must also look to the evidence elicited contrary to plaintiff's position [and] evaluate and resolve conflicts in the evidence....

*Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1568 (Fed.Cir.1984) (citations omitted); *accord Hersch v. United States*, 719 F.2d 873, 876 (6th Cir.1983); *Sanders v. General Serv. Admin.*, 707 F.2d 969 (7th Cir.1983) (citations omitted); 9A Wright & Miller, *Federal Practice and Procedure* § 2573.1 at 497–99 (1995). In short, when deciding a CIT Rule 41(c) motion, the judge presiding at the bench trial must unfurl the plenitude of his discretionary powers and decide whether the plaintiff sustained its burden of proof before it allowed the curtain to fall on its case in chief. The Court appraises

the credibility of witnesses and weighs all the evidence presented during the plaintiff's opening act, including evidence elicited contrary to plaintiff's position. Before granting the partial dismissal in this case, the Court made credibility determinations and weighed all the testimony presented as well as the documentary evidence received during the plaintiff's case in chief. Since defendants elected not to put on a case, the Court possessed just as much information when it rendered a decision on the merits under CIT Rule 41(c) as it did after the close of trial.

■ As an initial matter, defendants argue at length that the Court may not retrospectively apply the 1989 revised Customs definition of "fraud" to this case. When the alleged offenses were committed between March 1984 and June 1987, it was Customs' view that under § 1592, fraud "resulted from an act or acts (of commission or omission) deliberately done with intent to defraud the revenue *or to otherwise violate the laws of the United States ....*" 19 C.F.R. Part 171, App. B(B)(3) (1988) (emphasis added). Customs revised the regulation to read that a violation is "fraudulent if the material false statement or act in connection with the transaction was committed (or omitted) knowingly, *i.e.,* was done voluntarily and intentionally...." 19 C.F.R. Part 171, App. B(B)(3) (1989). The supposed problem with applying the revised regulation is that the 1989 "*ex post facto* definition dispenses with any requirement that the defendant intentionally acted to defraud Customs of revenue." Defs.' Pre–Trial Br. at 33. However, the former regulation relied upon by defendants itself dispensed with such a requirement. The former regulation could not be interpreted to contain such a requirement because § 1592 proclaims that liability for fraud may arise "[w]ithout regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby...."

■ Directly on point is *United States v. Modes, Inc.*, 16 CIT 879, 804 F.Supp. 360 (1992) ("*Modes I*"), where the Court ruled that an intent to defraud the revenue was not a necessary element of a § 1592 fraud case

---

6. At the close of trial, the government attempted to serve a set of interrogatories *on the Court.*

This misapprehension of counsel's role *vis a vis* the Court was rejected.

under the former unrevised regulation.[7] In order to aid in the foreign seller's evasion of Taiwanese taxes, the defendants in *Modes I* intentionally engaged in a double invoicing scheme in connection with duty-free merchandise imported into the United States pursuant to the General System of Preferences. The Court found that the defendants successfully negated allegations of an intent to defraud the revenue, but held that the defendants nevertheless were liable for fraud because they intentionally violated customs laws when they submitted false invoices. *Id.* at 883, 804 F.Supp. at 365. The Court has previously recognized that under the former regulation, customs fraud could be premised upon the intentional violation of any customs statute. In *Modes I,* Judge Newman seized upon the broad grasp of the regulatory language to rule:

> "Defendants' contention that they did not know that their false invoices would defraud the Government of revenues is not dispositive of whether defendants intended to violate U.S. law within the meaning of the [pre–1989 fraud] regulation.... [Defendant's] critical and unqualified admission in his deposition that he knew that the double invoicing scheme was not 'legal' is dispositive of his liability for fraud under § 1592 pursuant to the second broad formulation for fraudulent intent under the regulation"

*Modes I* at 883, 804 F.Supp. at 365 (footnote omitted). The Court agrees that § 1592 as correctly interpreted by the unrevised regulation imposes liability for intentional violations of import laws regardless of any intention to deprive the government of lawful duties. Therefore, in order to prevail on its fraud claim against Hitachi America, the government needed to show merely that Hitachi America knowingly violated § 1484 or § 1485. Of course, the government could also prove fraud by showing an intent to defraud the revenue and attempted to do so.

## A. The Government Did Not Prove That Hitachi America Intended To Deprive The Revenue

[21] The government describes a byzantine conspiracy to defraud the revenue of the United States. While the Court holds both Hitachi corporations to have been negligent in the conduct of Hitachi America's importations, their reference, more than ninety times on entry documents, to the underlying contract containing the escalation provision simply does not comport as a matter of fact, with an intention to defraud. Further, the pre-importation meeting with the Import Specialist in the principal port of importation—and the government's suspicious destruction of the records of that meeting—at which meeting the contract must have been discussed (otherwise, why the meeting?) added to the numerous internal memoranda indicating an interest in finalizing the importer's Customs obligation do not comport with an intention to commit fraud and thoroughly negate the recklessness requisite to a finding of gross negligence.

Mr. Yamasaki, the Hitachi Japan official who calculated all the figures associated with the MARTA project, always included EPA and MVA duty estimates in his initial allocations for Hitachi America's budget. Later, in 1984, Mr. Yamasaki learned that in other long-term projects, EPA had not been listed on the commercial invoices or reported to Customs without adverse consequence; thus, he informed other Hitachi Japan officials to arrange for the return of funds that had originally been budgeted to Hitachi America for escalation payments. The following correspondence, claims the government is their best evidence for an intent to defraud the revenue: Hitachi Japan officials sent a telex to Mr. Toda on February 28, 1984:

> [S]ince it was as follows in the Ludington hydraulic turbine case which was handled five years ago, we would like you to investigate the present state of affairs.

---

7. It is true that judges on the Court of International Trade are not bound by each other's decisions. *Algoma Steel Corp., Ltd. v. United States,* 7 Fed. Cir. (T) 154, 156, 865 F.2d 240, 243 (1989) ("among trial courts it is unusual for one judge to be bound by the decisions of another and, if it is to occur, such a rule should be stated some-

where. That is not done here; with all the criticism directed by appellants towards Judge Restani for not following Judge Newman, nowhere is anything pointed out saying she must"). Although not binding, Judge Newman's sage decisions in the *Modes* cases are highly persuasive to this Court.

(1) Under the U.S. regulations of that time, in cases where the contract between customer and supplier clearly stated that duties also apply to the escalation, additional levies were to be made (that is, at the time of shipping the original amount is listed and *later on the escalation portion is reported as well*).

(2) In the Ludington case, this was not explicitly stated in the contract, so the original contract price was invoiced. No problems occurred afterwards.

(emphasis added). Mr. Toda responded on March 9:

According to U.S. Customs regulations, in a contract with EPA, even if it is not expressly stated in the contract that the escalation portion is dutiable, *it is subject to duty.*

Heretofore at Hitachi America, with regard to this point, the work has not been performed strictly. In Power contracts also, the actual practice seems to have been that the commercial invoice was drafted using the PO (base price) at the time of shipping, and that the escalation portion was not declared.

In the MARTA contract, the final price is not yet available at the time of importation, and Hitachi America Legal [Department] is presently studying how we should handle the commercial invoice.

(emphasis added). Hitachi Japan replied the next day:

In the process of confirming whether the customs invoice should be issued with a correction for the escalation portion, or whether it is okay to use the base price.

Because the assessment of the duty payment amount of [Hitachi America] includes the EPA, MVA adjustment amount, if it is okay to use the base price, it is necessary to negotiate the return to Hitachi [Japan] of the difference between the actual payment amount and the assessed amount.

In its Pre-trial Brief, the government declared that this final communication "articulates the motives of [Hitachi Japan] more succinctly than any other document...." *Id.* at 20. This communication, offered to the Court as the documentary centerpiece of the government's fraud scenario, falls far from constituting clear and convincing evidence of an intent to defraud the revenue. Although it could possibly be consistent with a matrix of an intent to defraud, the Court will not engage in the wild speculation urged by the government. The document is entirely consistent with an intent to pay at the end of the project, and the series of correspondence explicitly includes a statement that escalation payments are reported at a later date. The main subject of the discussions is how to deal with the invoice. It would not be unreasonable for the parent company to seek repatriation of duty budget in 1984 if it believed that EPA duty was payable at the end of the decade. The government's belief that this communication was a camouflaged directive in furtherance of a scheme to defraud the revenue is mere conjecture. Less than a month after this exchange, Mr. Toda received Ms. Crecco's memo stating that estimated duties should be deposited on EPA or liquidation held open under customs laws. Mr. Toda did not remember why he changed his mind and no evidence illuminates his motivations.

The government's second highly touted document bears notes taken down by a Hitachi Japan employee, Mr. Kikuchi, regarding a telephone call he had with Mr. Yamasaki. The government explains that Mr. Kikuchi, new to the MARTA project, was to relay this information to his superior, who was also unfamiliar with the project. The notes read:

Kasado bears the import duty in the end.

Because the steps are

| CIA to | [Hitachi America] to | Kasado |
|---|---|---|
| (1) payment on behalf | (2) invoicing | (3) invoicing |

This initially belonged to the [Hitachi America] scope, but the surplus due to the savings on duty from the declaration is Kasado's

Mr. Yamasaki testified that this discussion revolved around duty exemption for U.S. parts shipped to Japan and then reimported in the assembled subway cars. Mr. Kikuchi could not remember the circumstances surrounding his notes. Again, although the statement about duty saving could be consistent with an intent to defraud, it is not the

kind of highly probable material that gives rise to clear and convincing evidence.

There are other circumstances tending to negate an intent to defraud the revenue. The MARTA contract was a public contract and a press release announced that MARTA had included an estimated $3.7 million dollars in EPA payments during the course of the project. Hitachi America listed the underlying contract, "CQ–311", *ninety-two* times on the entry documents. The Court entertains an inference that the document was in the possession of the Savannah Import Specialists, a piece of information they routinely request for long-term multiple-entry projects; moreover, because of the outlandish destruction of the files after the government commenced its investigation, the Court entertains an adverse inference that the Import Specialists were apprised of the escalation clauses. Although not part of the period in which the government alleged fraudulent conduct, Hitachi America's behavior in the final years of the project manifests an intent to pay EPA duty, and that bears on its state of mind in the earlier years of the project. The evidence before the Court shows that the allegation of an intent to defraud the revenue is not proven.

## B. *The Government Did Not Prove That Hitachi America Intended To Violate Customs Laws*

The question remains whether Hitachi America committed fraud by knowingly violating customs laws even if it did not intend to defraud the revenue. The government failed to prove its case. At the outset, it hardly bears explanation that the government failed to prove Hitachi America knowingly violated the law by means of the dollar denominations on the invoice. First, the government argued the dollar transaction theory so it never alleged or argued that Hitachi America knew the transaction was in yen; concomitantly, it never alleged or argued that the dollar denominations were materially false because they understated the value of yen sent abroad. True enough, Ms. Hansen's provocative statement in her February, 1988 memo that "[s]ome people feel … the way money is transferred back to Japan, makes MVA dutiable" is some evidence that

Hitachi America actually knew yen were being remitted by CIA. But standing alone, it is quite distant from clear and convincing evidence.

There was one question during the course of litigation that reared repeatedly: where were CIA and CIJ? Why were they not joined by the government in this action? For unknown reasons, the government has chosen to proceed in a separate action—if at all—against those two parties. It is now accepted by all the parties that CIA sent a fixed amount of yen to CIJ regardless of MARTA's MVA payments; but CIA's recalcitrance in providing Hitachi America with payment records shows that CIA was particularly secretive about who assumed the risk of currency fluctuation between it and its parent. This suggests that Hitachi America in fact did not know the amount of yen being remitted abroad. Because government counsel rebuffed the views of its client, Customs, its theory of the case was incompatible with what it needed to prove on this issue. CIA and CIJ appear to be highly appropriate, if not essential, parties defendant to this action, rather than the subject of a separate suit.

With regard to EPA, the government relies emphatically on two "hot" documents which the Court finds rather tepid. With respect to the Toda period, the government argues that Ms. Crecco's 1984 memo imprinted him with the knowledge that in order to escape the requirement of paying duty at once on EPA receipts, he had to arrange for suspended liquidation or deposit estimated duties. There are critical flaws in this argument. First, government counsel itself elicited testimony from Ms. Crecco that Mr. Toda's English was very poor at the time she wrote that memo. Second and more important, advice from a lay employee who had recently ascended from a clerical position does not constitute an authoritative interpretation of law. An expert's advice does not even constitute an authoritative interpretation of law. *Cf. Gates & Fox v. OSHRC*, 790 F.2d 154, 156–157 (D.C.Cir.1986) (Scalia, J.) (company not on notice of regulatory requirement by virtue of expert interpretation); *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir.1996) (informal advice from agency employee to

cease a questionable practice does not "indicate that the agency considered the practice a violation of the Rule"). Ms. Crecco's memo is evidence that Mr. Toda should have looked further into the matter, but it did not serve to invest him with actual knowledge. This same argument applies to the government's second "hot" document, the memo Ms. Hansen wrote to Mr. Taga. All Hitachi employees testified that they never came to doubt the permissibility of paying EPA at the end, and though the memos from lay employees are circumstances which should have alerted the MARTA overseers to their duty to pay on EPA at once, actual knowledge of a violation has not been demonstrated by clear and convincing evidence. Compare other cases where the Court has found fraud. *United States v. Thorson Chem. Corp.*, 16 CIT 441, 795 F.Supp. 1190 (1992) (defendant admitted that it used double and sometimes triple invoicing scheme); *United States v. Modes*, 16 CIT 879, 804 F.Supp. 360 (1992) (defendant admitted to double invoicing); *United States v. Daewoo Int'l (Amer.) Corp.*, 12 CIT 889, 696 F.Supp. 1534 (1988) (prior guilty plea to false statements).

The record of this case demonstrates that it was in 1991, two years after the criminal investigation and during the pendency of this civil litigation when the government destroyed potentially exculpatory information contained in both the Savannah District's and the National Import Specialist's files, in violation of its own written policy. The government's retention policy required the retention of documents "directly pertinent to litigation." See U.S. Customs, *Records Control Handbook* (1982) at 3. See also U.S. Customs, *Records Control Handbook* (1990) at II–3 (records may be destroyed if they have no legal value). The Court is taken aback by this conduct and under the facts of this case would be inclined to deny the fraud count based on this circumstance alone.

### III. *Hitachi America Did Not Commit Gross Negligence*

 For gross negligence claims, "[T]he United States shall have the burden of proof to establish all the elements of the alleged violation." § 1592(e)(3). "The gross negligence standard has been defined as re-

quiring willful, wanton, or reckless misconduct, or evidence of 'utter lack of all care.' " *Machinery Corp. Of Amer. v. Gullfiber AB*, 774 F.2d 467, 473 (Fed.Cir.1985) (quoting Prosser and Keeton, The Law of Torts, § 34 (4th ed.1984)). Customs' regulation reads: "A violation is determined to be grossly negligent if it results from an act or acts (of commission or omission) done with actual knowledge of or wanton disregard of the relevant facts and with indifference to or disregard for the offender's obligations under the statute." 19 C.F.R. pt. 171 App. B(B)(2). The Court will hold a defendant liable for a grossly negligent violation of § 1592 if it behaved willfully, wantonly, or with reckless disregard in its failure to ascertain both the relevant facts *and* the statutory obligation.

Once again, the government bore the burden to show that Hitachi America was at fault for not ascertaining that yen was being remitted abroad, and this it neither alleged nor attempted to prove. When the burden is on the defendant to show it exercised reasonable care, an argument that it was cut out of the information loop by its very own partner will not suffice when the basic facts show a violation of law. Under the gross negligence standard, the government bears the burden to show that the defendant was willful or wanton and that evidence is simply not before the Court. Moreover, it would be a mockery to hold that Hitachi America was grossly negligent by failing to ascertain that it had to report the yen sent abroad when the Justice Department insists that the transaction was in dollars even though it—and not Hitachi America—possesses all the payment information from CIA's records detailing the yen remittances.

 With regard to the failure to report EPA receipts, the case is closer but the Court cannot say that Hitachi America recklessly disregarded its obligation to pay EPA duty at once. The documents in evidence display an initial belief by Hitachi officials that it was permissible to pay aggregate EPA duty at the end of a long term project. All of the Hitachi officials who testified at trial asserted their belief that it was permissible. Although the testimony was self-serving, the Court gives it some

weight. Disregarded advice from lay employees does not entail recklessness, though disregarded advice from experts or legal counsel might satisfy the test. In fact, however, when defendants' consulted legal counsel, they were advised NOT to pay until final amounts were ascertained. Government counsel frequently erupted into testimony that it is common knowledge in the import community that importers may not privately run a tally on EPA and announce with impunity the aggregate duty at the end, but the government failed to call a *single* Import Specialist to testify to that common knowledge. The duty to pay at once on EPA receipts absent suspended liquidation or the deposit of estimated duties, while undeniably extant, apparently is not blatant. If it were, the Court would have seen an expert within the customs community testify on the government's behalf. Finally, the Court entertains the adverse inference that exculpatory evidence may have been contained in Customs files, and the Court must not condone unconscionable government conduct to the extent available under the gross negligence standard when a defendant may have been deprived of vindicating facts.

### IV. Hitachi Japan Is Liable For Aiding Or Abetting Hitachi America's Negligence

[25] Hitachi Japan argues that a party cannot be liable for aiding or abetting another's negligence. Hitachi Japan asserts, "Aiding and abetting is, by its terms, an intent-based concept.... The government would have to prove a paradoxical set of facts—that [Hitachi Japan] *knew* that Hitachi America was committing negligence, and then intentionally assisted in Hitachi America's alleged negligence—in order to prove aiding and abetting negligence." Hitachi Japan's Post-Trial Br. at 12.[8] Indeed, some Courts have ruled that there can be no action based on the aiding and abetting of civil negligence. *See In Re American Continental Corp.,* 794 F.Supp. 1424, 1439 (D.Ariz.1992) (refusing to recognize action for aiding and abetting civil

negligence); *cf. Rogers v. Furlow,* 699 F.Supp. 672, 675 (N.D.Ill.1988) (claim of conspiracy to commit civil negligence called "a paradox at best"); *Koehler v. Pulvers,* 606 F.Supp. 164, 173 (S.D.Cal.1985) ("The allegation of civil conspiracy appears inherently inconsistent with the allegation of an underlying act of negligence"). Nevertheless, a court should " 'give effect, if possible, to every clause and word of a statute,' " (*United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (quoting *Montclair Tp. v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1883))), and in the instant case the Court draws on the common law to give effect to the cause of action Congress intended to create. There is ample common law doctrine informing the meaning of the statutory term and the Court rules that there exists a cause of action under § 1592 for aiding or abetting a negligent violation of the customs laws.

■ The Court's use of common law doctrine to flesh out statutory language is appropriate. "When Congress borrows a common law term in a statute, absent a contrary instruction, it is presumed to adopt the term's widely accepted common law meaning." *Mars, Inc., v. Kabushiki–Kaisha Nippon Conlux,* 12 Fed. Cir. (T) ——,——, 24 F.3d 1368, 1372–73 (1994). "[T]he applicability of common law doctrines in litigation under federal statutes depends on whether those principles advance the goals of the particular federal statute which plaintiffs allege has been violated." *Petro–Tech, Inc. v. Western Co. of N. Am.,* 824 F.2d 1349, 1356 (3d Cir.1987), (citing *American Soc'y of Mechanical Eng'rs v. Hydrolevel Corp.,* 456 U.S. 556, 570, 102 S.Ct. 1935, 1944–45, 72 L.Ed.2d 330 (1982)). The goal of the statute was to create aiding or abetting liability for any underlying violation of the penalty statute; drawing on accepted common law meaning to inform that statutory cause of action is useful in effecting that goal. At the outset the Court emphasizes that § 1592(a)(1)(B) creates a cause of action for aiding *or* abetting, not for aiding *and* abetting. According

---

**8.** It is important to keep in mind that conspiracy is different from a charge of aiding or abetting because conspiracy requires an agreement among tortfeasors to accomplish the tortious end.

to *Black's Law Dictionary*, "to abet" means "[t]o encourage, incite, or set another on to commit a crime." *Black's Law Dictionary* 5 (6th ed. 1990) "To aid" means "[t]o support, help, assist, or strengthen. Act in cooperation with; supplement the efforts of others." *Id.* at 68. To aid therefore involves mere assistance rather than the encouragement or advocacy requisite to abet. Although the following exegesis of relevant law deals with the tort of aiding *and* abetting, a defendant may be liable under § 1592(a)(1)(B) so long as it assisted or supported another's negligence even if it did not encourage it.

Several jurisdictions have recognized a common law action for aiding and abetting negligence. *See, e.g., RTC v. Farmer*, 823 F.Supp. 302, 309 (E.D.Penn.1993); *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C.Cir. 1983) (vicarious liability could arise where defendant "substantially aid[ed] negligent action"); *Winslow v. Brown*, 125 Wis.2d 327, 371 N.W.2d 417, 421–22 (1985) ("we conclude that a person may aid and abet a negligent tort"); *Lindsay v. Lockwood*, 163 Misc.2d 228, 625 N.Y.S.2d 393, 397 (Sup.Ct.1994); *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 811 P.2d 1220, 1232 (1991); *American Family Mut. Ins. Co. v. Grim*, 201 Kan. 340, 440 P.2d 621, 625–26 (1968); *Price v. Halstead*, 177 W.Va. 592, 355 S.E.2d 380, 386 (1987); *Cobb v. Indian Springs, Inc.*, 258 Ark. 9, 522 S.W.2d 383, 388–89 (1975). These cases uniformly rely upon § 876(b) of the Restatement (Second) of Torts ("Restatement § 876(b)") to establish and articulate the elements of a cause of action for aiding and abetting. Although it is rare for the text of a Restatement to attain authoritative status, in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 177, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994), the Supreme Court wrote, "To be sure, aiding and abetting a wrongdoer ought to be actionable in certain circumstances. *Cf. Restatement (Second) of Torts § 876(b) (1977)*." *Id.* (emphasis added). The Supreme Court proceeded to discuss how some state jurisdictions have adopted the tort of aiding and abetting as described in Restatement § 876(b) and others have declined to do so. *Id.* at 181–182, 114 S.Ct. at 1450–1451. Regardless of state law, "Congress knew how to

impose aiding and abetting liability when it chose to do so." *Id.* at 176, 114 S.Ct. at 1447–48. Congress expressly intended to create a cause of action for aiding or abetting a negligent violation of the customs penalty statute, and the Court leverages the language of Restatement § 876(b) and other courts' interpretations of that language in order to animate the Congressional intent manifested in § 1592(a)(1)(B).

The leading authority on what constitutes the tort of aiding and abetting appears in Restatement § 876(b):

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself....

*Id.* Comment *d* to Restatement § 876(b) states:

> If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. This is true both when the act done is an intended trespass ... *and when it is merely a negligent act.* ...
>
> The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other. In determining this, the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered.

*Id.* cmt. d (emphasis added). Restatement § 876(b) Comment *d* expressly includes negligence among the underlying torts which can give rise to vicarious liability under an aiding or abetting theory. Since the standard of conduct by which negligence is determined is an objective one, liability for negligence abstracts from the defendant's actual state of mind and looks to what a reasonable person would have done under the circumstances. It would be absurd to condition aiding or abetting liability upon actual knowledge of the underlying tort when the principal tort-

feasor might not have discerned the foreseeable risk of harm. Consequently, the condition in Restatement § 876(b) to the effect that a defendant must "know[ ] that the other's conduct constitutes a breach of duty" means that an aider or abettor of negligence should have known that the underlying tort was being committed. It is also particularly appropriate to find that negligence satisfies the condition of "knowing" when, as here, the statute creates liability for aiding or assisting regardless of any abetting or encouragement. Furthermore, although none of the relevant cases from the civil arena expounds on the basis of liability for aiding or abetting negligence, in the criminal arena "[t]he state of mind required for conviction as an aider and abettor is the same state of mind as required for the principal offense." *United States v. Valencia,* 907 F.2d 671, 680 (7th Cir.1990). The Court rules that negligence is a basis of liability for aiding or abetting a negligent violation of the Customs penalty statute.

Based on Restatement § 876(b), courts have determined that the tort of aiding and abetting involves three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *See, e.g., Halberstam,* 705 F.2d at 477; *accord, e.g., State ex rel. Mays,* 811 P.2d at 1232; *Lindsay,* 625 N.Y.S.2d at 397; *RTC v. Farmer,* 823 F.Supp. at 309. "By definition, then, the act rendered unlawful under an aiding and abetting theory is different than the act rendered unlawful by the underlying tort." *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1430 (3d Cir.1994). Accordingly, Hitachi Japan will be held liable if it substantially assisted Hitachi America's conduct but failed to exercise reasonable care to determine whether Hitachi America's conduct was negligent and thus tortious. This formulation of the tort possesses the dual virtue of resolving the patent ambiguity contained in the second element of the offense while simultaneously honoring the burden-shifting mandate of § 1592(e)(4). That is, by requiring that a defendant "be generally aware of his role as part of an overall illegal or tortious activity", the second element of the tort could mean that the defendant must be either generally aware of its actions or generally aware that the underlying tort is being committed. The former interpretation would make the second element of the tort's formula redundant with the third, for substantial assistance involves significant and intentional role playing. The latter interpretation, embraced by the Court, assimilates general awareness to breach; thus, it is the defendant's burden to show that it exercised reasonable care in ascertaining whether it was substantially assisting illegal conduct. The general notion the tort reflects is that once a party has become enmeshed in another's conduct by encouragement or assistance, it opens itself to liability for that conduct. Once the government proved both a violation of customs laws and Hitachi Japan's substantial assistance in that violation, it became Hitachi Japan's burden to show that it exercised reasonable care to ensure that Hitachi America's conduct complied with the law.

Under the substantial assistance prong of the tort, the Court will look to six factors to determine whether Hitachi Japan extended substantial assistance to Hitachi America. Five of those factors are enumerated in Restatement § 876(b) Comment *d:* the nature of the act the defendant assisted or encouraged, the amount of assistance the defendant provided, the defendant's presence during the act, the relationship between the defendant and the principal tortfeasor, and the defendant's state of mind. Restatement § 876(b) cmt. d. In addition to these factors, some courts have added a sixth: the duration of the assistance provided. "The length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." *Halberstam,* 705 F.2d at 484; *accord State ex rel. Mays,* 811 P.2d at 1232. The Court is mindful that incidental participants such as freight forwarders and customs brokers must not be swept within the ambit of aiding or abetting liability and thereby treated as insurers of their customers. The tort

378

of aiding or abetting must be "designed to insure that innocent, incidental participants in transactions later found to be illegal are not subject to harsh, civil, criminal, or administrative penalties." *Investors Research Corp. v. SEC*, 628 F.2d 168, 177, (D.C.Cir. 1980). The Court is convinced that the penetrating six factor substantial assistance analysis will shield innocent parties from torts they did not foment.

■ Hitachi America ran afoul of customs laws so the first prong of the aiding or abetting tort is satisfied. The Court now turns to the substantial assistance test. The nature of the act was simple negligence, so the Court must carefully guard against strict liability. Hitachi Japan provided a tremendous amount of assistance to Hitachi America in its importing activities. Hitachi Japan negotiated the contract with MARTA without Hitachi America's involvement. Hitachi Japan constantly conferred with Hitachi America over the contents of the entry documents. Hitachi Japan allocated duty budget to Hitachi America so that Hitachi America could cover its duty liability, proving that Hitachi America was earning a nominal sum on the deal. The configuration of the transaction and the role of Hitachi America in it was dictated from Japan. There was continuous correspondence between the two over the transactional issues relevant to entry documents and duty payments, and Hitachi Japan advised Hitachi America on the issues and even indicated an intent to conduct its own legal investigation into the MARTA customs issues.

The next relevant factor is the parties' relationship, which is that of parent and wholly owned subsidiary. This was a very close working relationship. Hitachi Japan officials were sent to Hitachi America to direct the MARTA project and were rotated back to Hitachi Japan with full knowledge of all the issues. Hitachi America, according to Ms. Hansen's testimony, struggled to build a consensus among Hitachi Japan officials that outside counsel should be retained to resolve the problems. This relationship partly plays into the next factor, Hitachi Japan's state of mind. All Hitachi Japan officials who testified stated that they knew EPA was dutiable, and they knew there were associated disclosure and reporting obligations. They were fully aware of potential invoicing and reporting pitfalls. Finally, the duration of the assistance spanned nearly a decade. The factors lead unswervingly to the conclusion that Hitachi Japan provided Hitachi America with substantial assistance with regard to both the invoicing and the reporting issues. Hitachi Japan substantially assisted Hitachi America in its course of conduct.

Hitachi Japan failed to prove that it acted with reasonable care to ascertain whether Hitachi America should list yen on the entry documents and whether Hitachi America should report EPA payments when received. Hitachi Japan was receiving yen from CIJ and Hitachi Japan has not argued that it made any efforts whatsoever to ascertain whether CIA was likewise remitting yen to CIJ. Hitachi Japan has not argued that it made any such inquiries. No doubt it had some bargaining power with the co-owner of its joint venture to gather that information. Mere protestations of lack of knowledge do not prove reasonable care. Second, Hitachi Japan sought to repatriate funds it initially had allocated to Hitachi America for EPA duty payments based on the incorrect belief that it was permissible to pay EPA duty at the end of the project without making prior specific arrangements with Customs. In one correspondence Hitachi Japan expressed an intention to conduct an independent legal examination of the duty issues but there is no evidence that it did so. Hitachi America also had to build the consensus within Hitachi Japan that there might be a problem, which suggests some inertia in resolving the customs issues.

Hitachi Japan argues that it exercised reasonable care by allocating EPA duty budget, by seeking advice on disclosure and reporting obligations, and by supporting Hitachi America's efforts to calculate and tender EPA duty toward the end of the project. The Court is not persuaded that this rose to the level of reasonable care. Although it is true that Hitachi Japan allocated duty budget, it is also apparent that it sought to repatriate duty budget that it incorrectly assumed would not be required until the end of the project. Moreover, Ms. Hansen's testimony persuades the Court that even though

duty had been allocated on paper, there was some reluctance by Hitachi Japan to permit the actual expenditure of that budget. With regard to seeking advice, the evidence suggests that Hitachi Japan was leading Hitachi America into the conclusion that it was permissible to pay EPA at the end based on the elusive past practice. Hitachi Japan never urged Hitachi America to explore the issues with counsel. Although Mr. Toda sought and received advice from Ms. Crecco regarding suspending liquidation and depositing estimated duties, Mr. Toda reversed the decision he communicated to Hitachi America; there is no evidence that Hitachi Japan sought assurances that his decision conformed with law. Hitachi Japan's support near the end of the project for Hitachi America's efforts to calculate duty owed on EPA do not prove that Hitachi America acted reasonably with respect to the duty to pay EPA at once; rather, this was purely a remedial measure that was taken at the end of the project when the violations had already occurred.

## V. *Calculating The Amount Of Penalty*

### A. *The Loss of Revenue Must Be Calculated Based On The Sums Paid By MARTA*

█ The government maintains that defendants are estopped from arguing the correct valuation because they did not protest the appraisals of any MARTA entry:

> "Hitachi America's right to protest the appraisal of a MARTA entry (based upon an argument that the appraisal was performed upon the wrong sales transaction) expired 90 days after the liquidation of each entry. 19 U.S.C. § 1514(a)(c). Neither Hitachi America nor Hitachi [Japan] ever filed a protest of the appraisal of any MARTA entry. Accordingly, the Customs Service's decision to use the transaction reported on the entry (*i.e.*, the sale from CIJ to Hitachi America) as the basis for appraisal became 'final and conclusive upon all persons' 90 days after the liquidation of such entry."

Pl.'s Post–Trial Br. at 25–26 (footnotes and citations omitted). However, the Court is in accord with a former holding directly on point:

The Court is aware of the fact that defendant is banned from instituting an action against Customs concerning the classification and valuation as prescribed by 19 U.S.C. § 1514. However, defendant, in defending an action instituted under 19 U.S.C. § 1592, may solely, as defense against the penalty sought, establish the correct valuation and classification.

*United States v. Zuber,* 9 CIT 511, 512, 1985 WL 25783 (1985). Thus, defendants were entitled to challenge both the methodology employed by the government to determine the amount allegedly owed, and, if negotiated, applicable penalties.

█ The determination of lost revenue is governed by the valuation statute, § 1401a. The preferred basis for arriving at the proper valuation is the "transaction value", defined as "the price actually paid or payable" by the importer to the seller, which in this case would be the price paid by the joint venture to CIJ. § 1401a(b)(1). In its Reply to Defendants' Pre–Trial Brief, the government "contend[ed] that the preferred method of appraisal is by reference to the price paid by the importer (Hitachi America) [to CIJ]." Pl.'s Reply to Defs.' Pre–Trial Br. at 5. Notwithstanding this representation and to the surprise of the Court, the government's expert auditor, Mr. Donohue, testified to the value of the dollar payments from MARTA to the joint venture. Mr. Donohue testified that based on the total EPA and MVA dollar amounts paid by MARTA to the joint venture, the loss of revenue equaled $947,854. Mr. Donohue explained that this calculation of lost duties was $96,399 greater than the $851,455 figure contained in the Pre–Penalty Notice because various escalation payments made in connection with final contract modifications were not included in the initial audit; a supplemental audit produced the additional $96,399. In its Post–Trial Brief, the government argues that $947,854 is the correct amount of lost duties from which to arrive at a penalty.

Mr. Donohue also performed a payments analysis on the spreadsheets obtained from CIA which allegedly record the flow of yen payments from CIA to CIJ. As it explained in opening argument, the government solic-

ited Mr. Donohue to perform this payments analysis in the event that the Court decided that the yen transaction from CIA to CIJ was the proper basis for valuation. Mr. Donohue testified that if the yen payments from CIA to CIJ were utilized to calculate the loss of duty, the translation of those amounts into dollars would represent $632,102 in lost revenue. Defendants argue that although the transaction between Hitachi Japan and CIJ serves as the proper basis of valuation, the $632,102 figure serves as an acceptable surrogate even though it includes CIJ's profit on its transaction with CIA; thus, $632,102, minus the duties lost in connection with the expired claims is the correct base from which to determine the maximum penalty allowed. Pursuant to the valuation statute and controlling jurisprudence, the Court agrees with the government that the dollar amount paid by MARTA to the joint venture must serve as the basis from which to calculate the loss of duty.

Although the transaction value, *i.e.,* the price paid by the importer to the seller, is the preferred method of valuation, § 1401a(b)(2)(A)(iv) specifies that the transaction value method is available only if "the buyer and seller are not related, or the buyer and seller are related but the transaction value is acceptable ... under subparagraph (B)." *Id.* Section 1401a(g)(1) defines the term "related party" to mean, *inter alia,*

> (F) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
> (G) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

*Id.* The statute also provides that

> The transaction value between a related buyer and seller is acceptable for the purposes of this subsection if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable; ...

§ 1401a(b)(2)(B). Defendants' position cannot be maintained under the provisions of the statute. The transaction between Hitachi Japan and CIJ is not statutorily viable under 1401a(g)(1)(G) because those two companies directly control the joint venture and, although defendants attest that the parties dealt with each other at arm's length, have not carried their burden of proof on the matter. There is no evidence in the record that the common control exerted by the parent companies over the joint venture did not influence the price paid or payable by CIJ. Moreover, the transaction between CIJ and CIA is not statutorily viable under 1401a(g)(1)(F) because the Court presumes, no doubt uncontroversially, that CIJ owns at least five percent of the shares of CIA. Defendants' proposed methods for valuation are necessarily rejected.

On the other hand, the government's position is fully supported by *Nissho Iwai American Corp. v. United States,* 10 Fed. Cir. (T) ——, 982 F.2d 505 (1992). *Nissho Iwai* involved a transaction remarkably similar to the case at bar. The Metropolitan Transportation Authority of New York City ("MTA") purchased rapid transit passenger cars from a middleman, the importer of record, which in turn purchased the cars from a Japanese manufacturer. Customs appraised the cars on the basis of transaction value. Customs used the price between the foreign manufacturer and the middleman to determine the transaction value of the first eleven entries, but used the price paid by MTA to the middleman to determine the transaction value of the later entries. The importer maintained that the transaction value of the later entries should also have been based on the price between the middleman and the foreign manufacturer, and the court agreed. The court, "[a]ccepting that both the manufacturer's price and the middleman's price may serve as the basis of transaction value ..." (*Id.* at ——, 982 F.2d at 510), ruled that "[o]nce it is determined that both the manufacturer's price and the middleman's price are statutorily viable transaction values, the rule is straightforward: the manufacturer's price, rather than the price from the middleman to the purchaser, is used as the basis for determining transaction value" (*Id.* at ——, 982 F.2d at 509). The defendants also at-

tempt to rely on *Nissho Iwai* but the transaction values they urge are not statutorily viable under the related party provisions of the valuations statute. In *Nissho Iwai*, the court was scrutinizing two transactions each of which it accepted as statutorily viable; here, the statute expressly forbids the Court from utilizing the transactions they urge. The government has not contested the statutory viability of the price paid by MARTA and the Court shall accept that position as did the court in *Nissho Iwai*. Furthermore, 1401a(f) of the valuation statute grants the Court wide discretion in determining value: "If the value of imported merchandise cannot be determined, or otherwise used for the purposes of this chapter, under [the previous subsections], the merchandise shall be appraised ... on the basis of a value that is derived from the methods set forth in [the previous subsections] ...." *Id.* at 1401a(f)(1). The evidence produced at trial has left the Court with only two options to choose from and since the related party yen valuation is expressly prohibited by statute, the Court must opt for the price paid by MARTA.

■■■ The wary reader may discern an ostensible inconsistency between the ruling that the valuation must be based on a dollar transaction and the holding that Hitachi America is negligent because it improperly invoiced in dollars. Yet the rule of law under the Code of Justinian and now the familiar maxim *"Caveat emptor"* expresses the common sense notion and the elementary economic principle that price and value are separate concepts. Hitachi America was required to list the *"purchase price* of each item *in the currency of the purchase* ...*"* (§ 1481(a)(5)). Even if it is not used to determine dutiable value, the purchase price listed on the invoice is a crucial figure that provides Customs with information which may, for example, help it to conclude that parties are not contracting at arm's length. The purchase price listed on the invoice is a fundamental index upon which Customs relies in performing a variety of its administrative tasks. The fact that the provisions of the valuation statute may require an appraisal based on something other than the purchase price does not vitiate the plain mandate of § 1481(a)(5). The complementary notion is that the operation of the valuation statute may not render the purchase price

false when appraisal is based on the currency of a transaction which is different from the correctly listed currency of purchase; in other words, had Hitachi America used the correct yen denomination, the fact that the appraisal is based on a dollar transaction would not constructively entail that Hitachi America submitted a false statement on the invoice.

**B. *The Statute Of Limitations Removes The First Twenty–One Entries From The Penalty Base***

The defendants argue that the statute of limitations applicable to 19 U.S.C. § 1592 actions truncates their liability for suit based on gross or simple negligence. The statute of limitations set forth in 19 U.S.C. § 1621 begins to run from the date any alleged negligent act is committed (and from the date an alleged fraudulent act is discovered):

> No suit or action to recover any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered: *Provided,* That in the case of an alleged violation of section 1592 of this title arising out of gross negligence or negligence, such suit or action shall not be instituted more than five years after the date the alleged violation was committed....

*Id.* In March and April 1991, Hitachi America and Hitachi Japan executed two-year waivers to any statute of limitations defense. At the time defendants executed the waivers, the statute of limitations had run on the initial twenty-two MARTA entries. The waivers expired on June 30, 1993 and on June 29, 1993, the government served process on defendants. As defendants concede, the waivers preserved the negligence and gross negligence actions on entries including and subsequent to March 1986, five years prior to the execution of the waivers. Defs.' Pre–Trial Mem. at 60 n. 20.

The waivers did not purport to effect a mere prospective waiver. Oddly enough, the waivers itemized forty-two entries and defendants agreed not to "assert any statute

of limitations defense in any action brought by the United States Government concerning forty-two (42) entries designated above with respect to the ... period for which the statute of limitations is hereby waived." [9] Although the language in the waivers conformed closely to the model waiver prescribed by the Customs Service in T.D. 76–33, 10 Cust. B. & Dec. 69 (1976), defendants omitted the model sentence declaring, "As of the date of this waiver, the statute(s) of limitations designated above has not yet run." Despite their apparent and coerced promise not to assert any defense whatsoever based on the statute of limitations, defendants pleaded the statute of limitations as an affirmative defense in their answers and raised it as a defense in their joint pre-trial memorandum. Furthermore, defendants raised the defense in their opening statements, Hitachi America raised it in its closing statement which was joined by Hitachi Japan, and Hitachi Japan raised it in its post-trial brief. Defendants' position is succinctly stated as follows: "Although Hitachi [Japan] and [Hitachi America] signed waivers of the statute of limitations in March and April 1991, these waivers—logically and legally—only served to waive the right to assert the statute of limitations for causes of action that had not yet expired. Indeed, the law does not permit the revival of a right that had been barred by the statute of limitations." Hitachi Japan's Post–Trial Br. at 37. The facile assertion of that principle extenuates some thorny issues. In any event, if the Court were to hold that the waiver was ineffective with respect to the initial twenty-one entries for which the government seeks recovery, then only the alleged loss of revenue on the twenty entries occurring from March 1986 through June 1988 may be used to calculate penalties. Due to the significant practical effect of such a holding, the Court reviews the relevant jurisprudence.

The Court would like to hold defendants accountable for the promise contained in their voluntary waivers. Unfortunately, the government at no time addressed the statute of limitations issue despite the fact that it was continuously aware that defendants were raising and arguing the defense. Defendants' answers admitted that the waivers were extant but also raised the statute as an affirmative defense. As noted *supra*, defendants argued the statute in pre-trial and post-trial briefs and in opening and closing arguments. The § 1621 waivers had been marked for trial as plaintiffs' exhibits, but the waivers executed by Hitachi Japan were absent from the roughly 2000 voluminous exhibits contained in the government's evidentiary arsenal. The government failed to introduce the waivers into evidence despite the fact that they could only inure to its benefit. The only mention the government made, either in memoranda or at trial, in connection with the statute of limitations issue was at the end of its closing argument:

> [Counsel for Hitachi America] suggests that there's a statute of limitations issue here with regard to negligence, and he says that the statute of limitations is five years. So, accordingly, if we have a six-year project, 99 percent of the product is shipped in the first five years, but the spare parts do not come in until the year six. By the time they are going to make their disclosure to the Customs Service, under that set of facts, there's no cause of action for negligence, because the five years have already elapsed here and Customs has no remedy for negligence.
>
> I would assume, your Honor, that there will be briefing on whatever statute of limitations issues that there might be, and it might be worthwhile to have specific briefs on that issue, any particular questions that the Court has specifically identified, I think it would be better to go back and forth, rather than to try and have both sides put in their brief on the same day. It's kind of hard to address the other side's arguments, but you can address that.

Tr. 3240–41. Apparently government counsel did not understand the operation of the statute: under the hypothetical, the statute would have run only on the importations that occurred in the first year. Had the government seized its final opportunity to address the issue in its post-trial brief, no doubt it would have accurately described the statute's

---

**9.** *The Government eventually sued on only forty-* one entries.

mechanics; but this it did not do. While it is mere conjecture and the Court has commented on the government's failure to include CIA and CIJ in this case, it may not be undue speculation to think that the government wants another bite at the apple by addressing this argument in its action against those two parties.

 In the interest of justice, on July 23, 1996 the Court issued a post-trial order commanding the parties to submit authentic copies of the waivers for inclusion in the record. Pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of defendants' waivers. The Court is empowered to take judicial notice of documents contained in the record *(see, e.g., United States v. Wilson,* 631 F.2d 118, 119 (9th Cir.1980)), and Hitachi America's waivers appear at Appendix page 435 of the Government's Motion for Partial Summary Judgment. The Court takes judicial notice of the Hitachi Japan waivers filed with the Court pursuant to Court order. Defendants did not object to the inclusion of the waivers in the record. The government always alleged and defendants always admitted that these waivers were executed and no party challenges their authenticity. The Court now turns to the substantive inquiry.

The assertion that the running of a statute of limitations may bar the right to sue as well as the remedy draws upon expansive Supreme Court precedent. In *Campbell v. Holt,* 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885), the Court held that a legislative act does not deprive an individual of property without due process of law when it removes a statute of limitations defense which could have been invoked to prevent the payment of a debt. In contrast,

> in an action to recover real or personal property, where the question is as to the removal of the bar of the statute of limitations by a legislative act passed after the bar has become perfect, [ ] such act deprives the party of his property without due process of law.

*Campbell,* 115 U.S. at 623, 6 S.Ct. at 211. The reason for the disparate outcome under the Due Process Clause is that when a statute of limitations has run, "[W]here the suits are for the recovery of specific real or personal property, ... the right of the plaintiff in the property was extinguished and had become vested in the defendant.... [I]n regard to debt or assumpsit in contract, the remedy alone is gone and not the obligation...." *Id.* at 625, 6 S.Ct. at 212. Nevertheless, in *Davis v. Mills,* 194 U.S. 451, 454, 24 S.Ct. 692, 693–94, 48 L.Ed. 1067 (1904) (Holmes, J.), the Court reasoned that in certain circumstances a statute of limitations also extinguishes the right to sue for purely monetary claims:

> [T]he ordinary limitations of actions are treated as laws of procedure, and as belonging to the *lex fori,* as affecting the remedy only, and not the right. But in cases where it has been possible to escape this distinction, courts have been willing to treat limitations of time as standing like other limitations, and cutting down the defendant's liability wherever he is sued. The common case is where a statute creates a new liability, and in the same section or in the same act limits the time within which it can be enforced.... It is ... a ground for saying that the limitation goes to the right created, and accompanies the obligation everywhere.

The issue in *Davis* was whether the defendant could avail himself of a Montana statute of limitations where suit was brought in another state but was based on a Montana statute creating a monetary cause of action against corporate directors. The statute of limitations specifically applied to suits against corporate directors and the defendant was being sued in that capacity. The Court ruled that

> while there might be difficulties in construing the general limitation upon actions for penalties as going to the right, this section is so specific that it hardly can mean anything else.... [The statute of limitations] so definitely deals with the liability sought to be enforced that, upon the principles heretofore established, it must be taken to effect [sic] its substance so far as it can, although passed at a different time from the statute by which that liability was first created.

*Davis,* 194 U.S. at 455–456, 24 S.Ct. at 694–695. In *William Danzer & Co., Inc. v. Gulf & S.I.R. Co.,* 268 U.S. 633, 45 S.Ct. 612, 69 L.Ed. 1126 (1925), the Court held that where the statute of limitations applied specifically to the cause of action created under the Interstate Commerce Act, retroactive extension of the limitations period to include a lapsed claim for damages would deprive the defendant of due process because the running of the statute extinguished the right to sue as well as the remedy. In *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945), the Court held that where the promulgation of a new limitations period removed any statute of limitations defense against a common law action for damages, due process was not violated because only the remedy had lapsed and not the right. A central distinguishing feature between the disparate results is that the right is extinguished when a special limitation period runs on a cause of action created by statute but only the remedy lapses when a general statute of limitations runs on a common law cause of action.

The 1978 revisions to the penalty statute, promulgated under the rubric of the Customs Procedural Reform and Simplification Act of 1978, Pub.L. No. 95–410, Title I, § 110(e), 92 Stat. 897 (1978), redefined the penal causes of action the government may bring against an importer. The prior penalty statute made no distinction between fraudulent, grossly negligent, and negligent violations, and it provided forfeiture or the domestic value of the merchandise as remedies. The new statute creates three levels of culpability (§ 1592(a)), different burdens of persuasion and proof corresponding to the level of culpability (§ 1592(e)), and different maximum penalties according to the level of culpability (§ 1592(c)). With the promulgation of these new rules, Congress "overhauled the civil penalty provisions contained in 19 U.S.C. § 1592." Kevin C. Kennedy, *Civil Penalty Proceedings Under Section 592 of the Tariff Act of 1930,* 10 Fordham Int'l L.J. 147, 147 (1987). Although there have been statutory provisions addressing false or fraudulent entry of merchandise since the nascence of this country, there are no common law antecedents to the penalty statute. The penalty provisions have always been statutory rather than common law causes of action. *See Caldwell v. United States,* 49 U.S. (8 How.) 366, 12 L.Ed. 1115 (1850) (discussing a customs penalty action arising under a statute promulgated in 1799). Black's Law Dictionary describes the term "common law" as follows:

> As distinguished from statutory law created by the enactment of legislatures, the common law comprises the body of those principles and rules of action, relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming, and enforcing such usages and customs.... In general, it is a body of law that develops and derives through judicial decisions, as distinguished from legislative enactments.... It consists of those principles, usage and rules of action applicable to government and security of persons and property which do not rest for their authority upon any express and positive declaration of the will of the legislature.

Black's Law Dictionary 276 (6th ed.1990) (citations omitted). Since the Customs Procedural Reform and Simplification Act enacted a novel penalty scheme that did not codify the common law, the reforms created new law for the purposes of the relevant Supreme Court jurisprudence. The same conclusion holds true for the revised special limitations provisions contained in § 1621. Therefore, the running of the § 1621 limitations period not only deprives the government of its remedy but also extinguishes its right to sue for civil penalties under § 1592. The question now becomes whether, by virtue of executing blanket waivers, the defendants revived the right of the government to sue on the extinguished causes of action.

■■■ As an initial matter, the fact that a statute of limitations has run on a statute does not necessarily entail that a court is deprived of jurisdiction to hear the matter. It is true that statutes of limitations may be jurisdictional in nature when they apply to a cause of action by which a government es-

chews its sovereign immunity in favor of vouchsafing its citizens a remedy for illegal government acts.[10] However, the Supreme Court recently diluted previous authority dubbing federal limitations periods jurisdictional when it held that "the same rebuttable presumption of equitable tolling [of statutes of limitations] applicable to suits against private defendants should also apply to suits against the United States." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990). Since equitable principles cannot conceivably expand a court's jurisdiction, *Irwin* signifies a retreat from the jurisdictional mold into which the Court has previously cast statutes of limitations conditioning the renunciation of sovereign immunity. *See, e.g., Fadem v. United States*, 52 F.3d 202, 206 (9th Cir. 1995); *Schmidt v. United States*, 933 F.2d 639, 640 (8th Cir.1991). *A fortiori*, statutes of limitations which do not condition a waiver of sovereign immunity do not operate as jurisdictional limits. Thus, statutes of limitations outside the context of sovereign immunity are not jurisdictional perimeters but rather are equitable constructs erected to foster judicial economy and to ensure basic fairness to alleged lawbreakers.

> Statutes of limitation find their justification in necessity and convenience rather than logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.... Their shelter has never been regarded as what now is called a "fundamental" right or what used to be called a "natural" right of the individual.

*Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945) (citation omitted). Since defendants possess no fundamental right in the shelter provided by a statute of limitations,

the running of the statute does not remove a cause of action from the court's jurisdictional compass: "filing a timely charge ... is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). Therefore, the fact that the statute of limitations had run on the early MARTA entries at the time defendants executed their waivers does not divest the Court of its jurisdiction to entertain suit based on those transactions. Although the expiration of the government's right to sue defendants did not result in a lack of jurisdiction, two questions remain: Did defendants possess the power to waive their rights to assert a statute of limitations defense before the Court? If so, did they or could they effectively waive those rights with respect to the causes of action which already had lapsed at the time they signed the waivers?

In *Midstate Horticultural Co., Inc. v. Pennsylvania R. Co.*, 320 U.S. 356, 358, 64 S.Ct. 128, 129, 88 L.Ed. 96 (1943), the Supreme Court held that the defendant's attempt to waive the statute of limitations for an action under the Interstate Commerce Act was "invalid as being contrary to the intent and effect of the section and the Act." The central intent of the Interstate Commerce Act was to guard against rate discrimination in the transportation industry, and permitting private litigants to negotiate waivers of the limitations period could enable *de facto* discrimination. *Midstate Horticultural Co., Inc*, 320 U.S. at 361–63, 64 S.Ct. at 130–32. Likewise, the Court held that a plaintiff's attempt to waive his right to recover liquidated damages under the Fair Labor Standards Act was ineffective because it contravened Congressional intent and public policy. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). In

---

10. It is the Court's view that constitutional imperatives such as due process trump the judicial construct of sovereign immunity and ensure that statutes of limitations conditioning the Government's liability for suit collapse under the weight of the indefeasible and inalienable democratic rights enshrined in the Bill of Rights. *U.S. Shoe*

*Corp. v. United States*, 19 CIT ——, 907 F.Supp. 408, 424–25 (1995) (Musgrave, J., concurring); *see Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir.1948), *Bartlett v. Bowen*, 816 F.2d 695, 708 (D.C.Cir.1987); *International Tel. & Tel. Corp. v. Alexander*, 396 F.Supp. 1150, 1163 n. 31 (D.Del.1975).

the latter case the Court ruled that "a statutory right conferred on a private party, but affecting public interest, may not be waived or released if such release contravenes the statutory policy." *Brooklyn Sav. Bank*, 324 U.S. at 704, 65 S.Ct. at 900–01. These precedents are inapposite to the instant case because 19 U.S.C. § 1592 confers a right on the government rather than on a private party and there is no evident Congressional intent that would be contravened by allowing potential customs penalty defendants to waive their right to a statute of limitations defense.

In the criminal context, federal circuit courts have held that defendants possess the power to waive a statute of limitations defense. Some courts have held that a mere guilty plea implicitly waives all nonjurisdictional defects including the statute of limitations defense. *See, e.g., Acevedo–Ramos v. United States*, 961 F.2d 305, 308 (1st Cir. 1992). Other courts emphasize the importance of a written waiver (*see, e.g., United States v. Del Percio*, 870 F.2d 1090, 1094 (6th Cir.1989)), or an express waiver of the defense in open court (*see, e.g., United States v. Akmakjian*, 647 F.2d 12, 14 (9th Cir.1981)). The rule in one circuit is that a defendant "who pleads guilty can challenge the prosecution as time-barred only insofar as the indictment on its face shows that the limitations period had expired" (*United States v. Helmich*, 704 F.2d 547, 548 (11th Cir.1983)), while the singular law of the Tenth Circuit is that a criminal statute of limitations "operate[s] as a jurisdictional limitation upon the power to prosecute and punish" so that in absence of an express waiver, a defendant may successfully allege the statute of limitations on appeal after having pleaded guilty (*United States v. Cooper*, 956 F.2d 960, 962 (10th Cir.1992)). The clear weight of authority supports the view that a statute of limitations does not operate as a jurisdictional bar and defendants therefore may waive the defense expressly if not implicitly. Although some of the relevant criminal cases emphasize that the waiver occurred prior to the running of the statute of limitations (*see, e.g., Del Percio*, 870 F.2d at 1094), they do not indicate that the outcome wholly depended on that fact. None of the criminal cases discusses the issue of remedy versus right.

Case law from the civil arena also instructs on the issue of whether and when a defendant may effectively waive a statute of limitations defense. Illinois courts hold that a "special limitations period created by a statutory cause of action, such as wrongful death, cannot be waived because it is a condition of the right to sue itself." *Phillips v. Elrod*, 135 Ill.App.3d 70, 88 Ill.Dec. 470, 474, 478 N.E.2d 1078, 1082 (1 Dist.1985) (citing *Muscare v. Voltz*, 107 Ill.App.3d 841, 63 Ill.Dec. 689, 691, 438 N.E.2d 620, 622 (1 Dist.1982) ("A special limitation ... may be contained within a statute that creates rights unknown to common law.... In such an instance, the time limitations in statutory causes of action are considered a condition of the liability itself and not one of remedy only")). Although in that circumstance the absolute prohibition against waiver in Illinois may be consistent with Supreme Court precedent ("[Limitations] provisions sometimes constitute a part of the definition of a cause of action created by the same or another provision, and operate as a limitation upon liability. Such, for example, are statutory causes of action for death by wrongful act" (*Danzer*, 268 U.S. at 637, 45 S.Ct. at 613)), this Court declines to rule that the customs penalty statutes always and absolutely prohibit a waiver of the limitations defense. Such a ruling would enshrine bad policy. Not only may the execution of a waiver serve the parties' interests by providing more time for government investigation and by enhancing defendants' possibilities to avoid suit, but in contrast to the circumstances discussed by the Supreme Court in *Midstate Horticultural Co., Inc.*, in this case there is no overwhelming Congressional intent or public policy foreclosing the waiver avenue.

The Court is not fully persuaded by jurisprudence emanating from bankruptcy and tax opinions holding that attempted waivers were ineffective. Several bankruptcy courts have held that statutes of limitations providing that "[a]n action may not be commenced after ..." a certain time period create a jurisdictional bar to bringing suit. *See, e.g., In re Butcher*, 829 F.2d 596, 600 (6th Cir. 1987), *cert. denied*, 484 U.S. 1078, 108 S.Ct. 1058, 98 L.Ed.2d 1020 (1988); *In re Barley*, 130 B.R. 66, 69 (Bankr.N.D.Ind.1991). Un-

less Congressional intent or public policy manifestly counsel otherwise, the extinguishment of the government's right to bring suit should not be considered a jurisdictional bar, and as discussed *supra*, the Supreme Court has retreated from viewing the quintessential candidate, *i.e.*, a statute of limitations conditioning sovereign immunity, as jurisdictional in nature. Moreover, the statute of limitations defense is an affirmative one which must be pleaded by the defendant under FRCP 8(c); to characterize certain statutes of limitations as jurisdictional perimeters would require a court to dismiss the tardy actions *sua sponte* (FRCP 12(h)(3)), an obligation inconsistent with the express provisions of FRCP 8(c). Under the Internal Revenue Code, a taxpayer's written extension of the limitations period was held invalid when the government failed to prove that the waiver was executed before the statute had run. *Mantzel v. Commissioner of Internal Revenue*, Tech. Mem.1981–169 (April 9, 1981), 41 T.C.M. (CCH) 1237, 1981 WL 10485; *see also Blustein v. Eugene Sobel Co., Inc.*, 263 F.2d 478, 482 (D.C.Cir.1959). However, these tax cases relied on the fact that the statutory waiver provisions expressly required that the waiver be executed before the limitations period had run.

The Court is favorably persuaded by other cases which have held that an attempt to effect a waiver of extinguished claims is ineffective. In *Chilean Nitrate Corp. v. M/V Hans Leonhardt*, 810 F.Supp. 732 (E.D.La. 1992), the court examined a statute of limitations providing that the defendant "shall be discharged from all liability ... unless suit is brought within one year ..." from the accrual of the action. The court held that

the evidence provided to the Court shows only that defendants agreed to the extension ... one year after the limitations period expired.... [T]he Court cannot say conclusively that the defendants initially agreed to an extension within the one-year limitations period. 'When by an exchange of letters, *before the running of the statute of limitations*, it is agreed to extend the time for a fixed and reasonable period, the carrier's waiver of the statute is for that period only.' *Monarch Industrial Corp. v. American Motorists Ins. Co.*,

276 F.Supp. 972, 979 (S.D.N.Y.1967) (emphasis added). While letters may have been exchanged before the statute ran in this case, the Court has seen no such evidence, and cannot now determine that [defendant's] defense is legally insufficient.

*Chilean Nitrate Corp.*, 810 F.Supp. at 736. There is also persuasive precedent issuing from the Supreme Court of Rhode Island, which cited "the general rule that ordinarily acts and conduct arising after the expiration of the time period for bringing suit cannot be relied upon to create either a waiver or an estoppel." *Cardente v. Travelers Ins. Co.*, 112 R.I. 713, 315 A.2d 63, 65 (1974). *Cf. Gale v. Great Southwestern Exploration*, 599 F.Supp. 55, 58 (N.D.Okla.1984) (ruling that where the federal statute of limitations states, "In no event shall any action be brought ...", the limitation conditions the right to bring suit and deprives the court of jurisdiction); *accord Engl v. Berg*, 511 F.Supp. 1146, 1150 (E.D.Pa.1981). The Court agrees with this line of cases and rules that because the running of the limitations period provided in § 1621 extinguishes the right of the government to bring suit, an attempt by a defendant to waive a statute of limitations defense to extinguished penalty actions shall be deemed ineffective when the defendant subsequently pleads and argues the statute of limitations before the Court.

It should be repeated that here the statute of limitations was "directed to the newly created liability so specifically as to warrant saying that it qualified the right." *Davis*, 194 U.S. at 454, 24 S.Ct. at 694. Section 1621 could hardly be more specific in its directive: "[I]n the case of an alleged violation of section 1592 of this title arising out of gross negligence or negligence, such suit or action *shall not be instituted* more than five years after the date the alleged violation was committed...." *Id.* (emphasis added).

The available legislative history does little to illuminate Congressional intent: "A suit brought to enforce a section 592 penalty arising out of gross negligence or negligence would have to be brought within five years after the violation occurs." H.R. Conf. Rep. No. 95–1517, at 11 (1978), *reprinted in* 1978

U.S.C.C.A.N. 2211, 2253. Nevertheless, the starkly prohibitive language of the statute itself specifically commanding the Executive Branch to refrain from bringing suit under § 1592 evinces that the right to sue is extinguished when the statutory period lapses. The attempt here by the Executive Branch to flaunt the legislative commandment embodied in § 1621 must fail when a defendant asserts the statutory defense in open court, notwithstanding any previously cowed and inoperative promises.

There is a further difficulty in holding otherwise. Because the right to bring suit against the initial twenty-one entries was extinguished at the time the waivers were executed, Congress would have contravened the Due Process Clause if it had promulgated a lengthier statute of limitations purporting to revive the extinguished claims. If the Legislative Branch created the burial tomb for the expired right it initially created, and the passage of time rolled the tombstone shut according to the statutory terms and opinions of the Judicial Branch, how might a private citizen assume the role of sovereign to revitalize and resurrect the expired claim? With regard to the extinguished rights of action, the government stands before the Court like Lazarus up from the dead; yet no private citizen is invested with sovereign political power, let alone a power lacking in Congress itself. This is not to say that the Court is deprived of jurisdiction to entertain suit on the extinguished claims: the ruling of the Court rests comfortably within an interstice of the law's "seamless web" and requires a defendant to assert a statute of limitations defense against extinguished claims before a court entertains the issue. The Court is aware of the assertion in a treatise that the statute of limitations defense "may be waived either before or after the expiration of the prescribed time limit." 51 Am.Jur.2d *Limitation of Actions* § 428 (1970). However, three of the four authorities cited in the treatise are either clearly distinguishable or do not stand for the proposition asserted: in *Titus v. Wells Fargo Bank & Union Trust Co.,* 134 F.2d 223, 224 (5th Cir.1943), the court reasoned, "Limitation statutes operate on the remedy. They do not extinguish the right"; in *Taylor v.*

*Soule,* 197 Okla. 45, 168 P.2d 281, 284 (1946), the court concluded that the defendants had waived the limitations defense by failing to plead it; in *Welton v. Boggs,* 45 W.Va. 620, 32 S.E. 232 (1898), the court held that a co-creditor may not plead on behalf of the defendant a statute of limitations defense that would have barred the other co-creditor's claim. The Court disagrees with *Parchen v. Chessman,* 49 Mont. 326, 142 P. 631, 633 (1914) ("a party may waive the benefit of the statute before or after the expiration of the prescribed time limit"). The Court also respectfully disagrees with *Union Bank of Switzerland v. HS Equities, Inc.,* 457 F.Supp. 515, 521 (S.D.N.Y.1978) wherein the court reasoned in perfunctory fashion that although the damages claim had lapsed before the waiver was executed, "[T]he Court can find no reason not to accept its terms as broadly as it is written."

By pleading the statute of limitations in their answers and arguing it in their joint pre-trial brief, opening and closing arguments, and post-trial briefs, defendants satisfied their threshold obligations to establish an affirmative defense based on the statute of limitations. Courts have taken a liberal approach in applying the Federal Rules of Civil Procedure to statutes of limitations. FRCP 8(c) includes statutes of limitations among the litany of defenses that must be affirmatively plead. While the general rule is that a party waives an affirmative defense by failing to raise it in the answer, "the majority of federal circuit courts have held that when a defendant raises an affirmative defense in a manner that does not result in unfair surprise to the other party, noncompliance with Rule 8(c) will not result in waiver of the affirmative defense." *Vermont Mutual Ins. Co. v. Everette,* 875 F.Supp. 1181, 1189 n. 3 (E.D.Va.1995) (citations omitted). Moreover, although the party asserting an affirmative defense normally carries the burdens of pleading, production, and persuasion, some courts have carved out an exception to this general rule in circumstances similar to the case at bar. Some courts have ruled that when the plaintiff's remedy as well as its right to bring suit have lapsed, the burden of pleading and one or both of the burdens of

production and persuasion fall upon the plaintiff to show that its action is not time-barred. *Emmons v. Southern Pacific Transportation Co.*, 701 F.2d 1112, 1118 (5th Cir.1983); *Davidson v. Wilson*, 973 F.2d 1391, 1402 n. 8 (8th Cir.1992); *Anixter v. Home–Stake Production Co.*, 939 F.2d 1420, 1434 (10th Cir.1991); *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir.1978); but see *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718–719 (7th Cir.1993). The Court is sympathetic to the notion that the extinguishment of the government's right to sue should ratchet up its burden to show that its claims are not time-barred.

 The Court rules that although defendants to a customs penalty action are required to plead the statute of limitations and carry the ultimate burden of persuasion on that affirmative defense, they only bear the initial burden of production to show that the government's claims are time-barred in connection with extinguished causes of action. The burden then shifts to the government to show that the extinguished claims are actionable by virtue of an equitable mechanism such as tolling. *United States v. Thorson Chemical Corp.* 16 CIT 441, 445, 795 F.Supp. 1190, 1193 (§ 1621 limitations period was tolled where waivers were executed before statute had run). In the instant case, the government entered the dates of the entries into evidence and defendants cited and argued § 1621 in their pleadings, briefs, and opening and closing arguments. To have required defendants to present a case in chief on their affirmative defense would have been a superfluous and pedantic exercise. What would defendants have done other than point to the dates of entry, the statute of limitations, and then argue the extinguishment of the right to sue on the initial twenty-one entries? No new evidence or arguments would have been presented to the Court. Defendants' initial burden of production was discharged by the government's own submission of the dates of entry into evidence. At all stages of litigation the government had an opportunity to argue equitable tolling but failed to do so. The Court has failed to identify any way in which the government could have been prejudiced by defendants' promise not to assert a statute of limitations defense with regard to the claims that were extinguished when the waivers were executed; for example, the government was not lulled into inaction on viable claims. The burden of production to show that the right of action on the first twenty-one entries had expired was satisfied by the government's evidence and the government failed to meet its resulting burden to show why the extinguished claims remained actionable notwithstanding the ineffective waivers. The Court holds that by pointing to the entry dates and arguing at all stages of litigation that the extinguished claims were time-barred, the defendants carried their burden of persuasion and established their affirmative defense in connection with the first twenty-one MARTA entries.[11]

### C. *The Court Assesses The Maximum Allowable Penalty*

 The penalty base is comprised of the dollar value of merchandise entered into the United States between March 11, 1986 and the end of the project. With the expired claims removed from the penalty calculation, $772,985 is the base amount from which the Court assesses the appropriate penalty. The Court arrived at this figure by consulting the figures contained in Mr. Donohoe's initial and supplementary audits listing the dollar amounts that MARTA paid to the joint venture. From March 11, 1986 until the end of the project, the initial audit showed a loss of $676,586 and the supplemental audit showed a loss of $96,399, for a total loss of $772,985. Mr. Donohue testified that there was no way to correlate payments to entries, but the Court notes that the Pre–Penalty Notice originally sent to Hitachi America listed the loss of revenue by entry and indicated $680,292 in lost revenue beginning with the March 11, 1986 entry. Although the basis for this

---

11. The Court recently rejected an odd argument by a defendant that the "continuing violation doctrine", which tolls a statute of limitations during a course of illegal conduct, was applicable to a § 1592 penalty case. *United States v. Complex Machine Works Co.*, 20 CIT ——, 937 F.Supp. 943 (1996). The Court dismissed the contention as a "fundamental misunderstanding" of the doctrine without addressing whether it has any relevance in penalty cases. *Id.* at ——, 937 F.Supp. at 944. Case law reveals that the doctrine has been applied only in employment relations cases.

latter figure is not supported in the record, it serves in part to satisfy the Court that the $676,586 figure from the initial dollar audit accurately reflects the loss of revenue from March 11, 1986 not including the amount from the supplemental audit, which, when included, brings the total to $772,985. The statutory maximum amount of penalty for negligence is two times the amount of lost revenue, § 1592(c)(3), or $1,545,970.

The Court has wide discretion in determining the amount of penalty to assess. The Court "does not start from any presumption that the maximum penalty is the most appropriate or that the penalty assessed or sought by the government has any special weight." *United States v. Menard,* 17 CIT 1229, 1229, 838 F.Supp. 615, 616 (1993) (finding that the appropriate penalty was equal to the amount of lost duties). Indeed, "Nothing in the statute precludes the court from awarding a penalty of zero in the event that factors justify such a judgment." *United States v. Modes (Modes II),* 17 CIT 627, 635, 826 F.Supp. 504, 512 (1993). *Modes II* identified ten specific factors that the Court might utilize to compute the appropriate amount of penalty:

(1) the defendant's good faith effort to comply with the statute;

(2) the history of previous violations;

(3) the nature and circumstances of the violation at issue;

(4) the degree of harm to the public;

(5) the defendant's ability to pay;

(6) the appropriateness of the penalty to the size of the defendant's business and the effect of the penalty on the defendant's ability to continue in business;

(7) the economic benefit to defendants of the violation;

(8) the value of vindicating agency authority;

(9 ) the gravity of the violation; and

(10) such other matters as justice may require.

*Id.* at 636, 826 F.Supp. at 513.

The defendants, who have no history of prior Customs violations, offer Hitachi America's intention to pay duty on escalation payments at the end of the project as evidence of good faith. Nevertheless, the evidence demonstrates that defendants were wrestling for several years with their known potential liabilities. In *Modes II,* the defendant immediately ceased his fraudulent behavior upon information by his attorney that his conduct was illegal. Here, defendants should have been more aggressive in resolving the issue. As Mr. Toda's efficient resolution of the invoicing problem concerning inconsistent F.O.B. prices on the entry documents illustrates, Hitachi America is a sophisticated enterprise whose officers knew how to resolve Customs issues expeditiously. The failure to consult with Customs, though not evidence of bad faith, negates the claim of good faith deserving leniency. Admittedly, the nature and circumstances of the alleged violation operate somewhat in favor of defendants because the fact that the transaction was truly in yen is something that the Justice Department currently denies. But this is only one factor. Defendants received an economic benefit from the time value of the funds that should have been paid as duties as the project transpired. One crucial circumstance justifying the imposition of a substantial penalty is that defendants are members of a large multinational business consortium generating billions of yearly revenues and possessing every ability to pay the fine imposed without suffering financial hardship. Every year, Hitachi businesses glean tens of millions of dollars of cash flow from operating in this country and should have ascertained their duties with an aggression commensurate with the benefit they receive from doing business here. Furthermore, the interest in vindicating Customs' role in monitoring imports and enforcing Customs laws is paramount. Consideration of the factors recommends the maximum fine, and the Court assesses a penalty of twice the amount of the lost duties, which is $1,545,970. This penalty assessment applies to defendants jointly and severally.

Hitachi America must also restore the loss of $96,469 to the government unaccounted for in Hitachi America's payment of $851, 385 of lost duties, the sum listed on the Pre–Penalty Notice. The true amount of lost duties not including the supplemental audit was established at trial to equal $851,455. Subtracting from that figure the sum that was paid in

response to the Pre–Penalty Notice equals $70. This $70 in lost duty must be added to the $96,399 figure from the supplemental audit to arrive at $96,469 in unpaid lost duties which Hitachi America must restore to the government. The statute of limitations as it was written at the time of the violations could not operate to reduce the amount of lost duties recoverable. *United States v. Jac Natori Co.*, — Fed. Cir. (T) ——, 108 F.3d 295 (1997).

■ Despite this substantial penalty, some might view the result of this case as a Pyrrhic victory for the government. After nine years of investigation and litigation that undoubtedly exacted millions of dollars of expenses from public and private resources, the government demonstrated that defendants are liable under the least severe provision of the civil penalty statute and must disgorge $1,545,970 in fine. The government spent the vast majority of effort and time vigorously pursuing its theory of "a garden variety customs fraud" entitling it to a sixty-three million dollar penalty, and Hitachi Japan argues that the government's victory is so meager that it is entitled to costs as a prevailing party. An analogous claim seeking reimbursement for attorneys' fees and expenses was cogently rejected by Judge Newman in *United States v. Modes, Inc.*, 18 CIT 153, 1994 WL 88927 (1994) ("*Modes III*"). In *Modes III*, Judge Newman assessed a $50,000 penalty for the double invoicing scheme in connection with the entry of duty-free merchandise. The government had sought the maximum fraud penalty of $2,325,000, which equaled the domestic value of the merchandise. Because the amount of the penalty judgment was so insignificant compared to the maximum potential recovery, the defendant argued that it should be deemed the prevailing party. As the prevailing party, the defendant would be entitled to its claim for attorneys' fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412. Judge Newman rejected the defendant's argument, noting that "[a] prevailing party is defined as one that 'succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Modes III*, 18 CIT at 155 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76

L.Ed.2d 40 (1982)). *See also Luria Bros. & Co. v. Allen*, 672 F.2d 347, 357 (3d Cir.1982) ("The losing party is not the prevailing party; what is black cannot be called white"). In the instant case, the government prevailed on the aiding or abetting claim and Hitachi Japan must bear its own costs.

## CONCLUSION

Hitachi America negligently violated 19 U.S.C. § 1481, 19 U.S.C. § 1484, and 19 U.S.C. § 1485 by listing incorrect dollar amounts on entry documents in connection with imported merchandise. Hitachi America also negligently violated 19 U.S.C. § 1485 by failing to report escalation payments as they were received. Hitachi Japan is liable for aiding or abetting Hitachi America in its tortious course of conduct. Pursuant to 19 U.S.C. § 1592, defendants are jointly and severally liable for the $1,545,970 penalty assessed by the Court, and Hitachi America must remit an additional $96,469, the remainder of lost duties it has not yet restored to the government.